# Exhibit A

## (part 1)

Case: 1:13-cr-00312 Document #: 1 Filed: 04/15/13 Page 1 of 103 PageID #:1

AO 91 (REV.5/85) Criminal Complaint

**FILED**
4-15-2013
APR 15 2013

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

AUSA Joel M. Hammerman    (312) 353-8881
AUSA Ryan S. Hedges       (312) 353-5340
AUSA Terra Reynolds       (312) 353-3148

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

UNITED STATES OF AMERICA

v.

EDWARD J. NOVAK;
ROY M. PAYAWAL;
VENKATESWARA R. KUCHIPUDI,
      also known as "V.R. Kuchipudi;"
PERCY CONRAD MAY, JR.;
SUBIR MAITRA; and
SHANIN MOSHIRI,
      also known as "Shawni Moshiri"

**CRIMINAL COMPLAINT**

CASE NUMBER **13 CR 312**

**UNDER SEAL**

**MAGISTRATE JUDGE MARTIN**

I, the undersigned complainant, being duly sworn on oath, state that the following is true and correct to the best of my knowledge and belief: from no later than March 2012 through in or around March 2013, in the Northern District of Illinois, Eastern Division, EDWARD J. NOVAK; ROY M. PAYAWAL; VENKATESWARA R. KUCHIPUDI, also known as "V.R. Kuchipudi;" PERCY CONRAD MAY, JR.; SUBIR MAITRA; and SHANIN MOSHIRI, also known as "Shawni Moshiri," defendants herein:

> conspired to knowingly and willfully offer and pay, and solicit and receive, remunerations directly and indirectly, overtly and covertly, in return for the referral of patients for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole or in part under a Federal health care program, in violation of Title 42, United States Code, Section 1320a-7b(b);

all in violation of Title 18, United States Code, Section 371. I further state that I am Special Agent with the Federal Bureau of Investigation, and that this complaint is based on the facts contained in the Affidavit which is attached hereto and incorporated herein.

Signature of Complainant
CATHY A. BARBOUR
Special Agent, Federal Bureau of Investigation

Sworn to before me and subscribed in my presence,

April 15, 2013
Date

at    Chicago, Illinois
City and State

DANIEL G. MARTIN, U.S. Magistrate Judge
Name & Title of Judicial Officer

4/15/13
Signature of Judicial Officer

UNITED STATES DISTRICT COURT      )
                                  )      ss
NORTHERN DISTRICT OF ILLINOIS     )

## AFFIDAVIT

I, Cathy A. Barbour, being duly sworn, state as follows:

## I.      Background of Affiant

1.      I am a Special Agent of the Federal Bureau of Investigation and have been so for approximately fifteen years. My responsibilities as an FBI Special Agent include the investigation of health care fraud and related white collar crimes. I have received specialized training in conducting health care and related fraud investigations and have participated in numerous health care fraud investigations. Along with other federal agents, I am responsible for the investigation of the executives, administrators and physicians associated with West Side Community Hospital, Inc., doing business as Sacred Heart Hospital.

## II.     Basis and Purpose of Affidavit

2.      The information contained in this Affidavit is based on my training and experience, my participation in this investigation, information that I have obtained from other federal agents and analysts involved in this investigation,[1] and information derived from other sources that I believe to be reliable, including: witness interviews,

---

[1] In particular, the FBI is being assisted in this investigation by Special Agents of the United States Department of Health and Human Services, Office of Inspector General.

consensually-recorded conversations of cooperating sources,[2] insurance claims data, public records and financial documents.

3.    This affidavit is submitted in part for the limited purpose of establishing probable cause to support a criminal complaint charging that from no later than March 2012 through in or around March 2013, Edward Novak, Roy Payawal, Dr. Venkateswara R. Kuchipudi, also known as "V.R. Kuchipudi," Dr. Percy Conrad May, Jr., Dr. Subir Maitra, and Dr. Shanin Moshiri, also known as "Shawni Moshiri," and others known and as yet unknown, have conspired to knowingly and willfully offer and pay, and solicit and receive, remunerations directly and indirectly, overtly and covertly, in return for the referral of patients for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole or in part under a Federal health care program, in violation of Title 42, United States Code, Section 1320a-7b(b), all in violation of Title 18, United States Code, Section 371.

4.    This affidavit is further submitted in part for the limited purpose of establishing probable cause to support applications for warrants to seize certain funds

---

[2]    This Affidavit includes summary descriptions of consensually-recorded telephone and in-person conversations. These summaries are based on my review of the recordings, draft transcripts, interviews with cooperating sources, my experience as a law enforcement officer and the experience of other law enforcement officers in this investigation, as well as information learned as a result of the investigation to date.  Any descriptions and/or quotations from recorded conversations come from draft, not final, transcripts and summaries of those conversations.  At various points in this Affidavit, I have placed in brackets or parentheses my understanding of what was being said during those conversations.  My understanding is based on the contents and context of the conversations and the investigation as a whole, my conversations with cooperating sources, my experience as a law enforcement officer, and the experience of other law enforcement agents and officers in this investigation.

maintained in the financial accounts identified in Attachment E, which funds constitute or are derived from proceeds traceable to the receipt of kickbacks in violation of Title 42, United States Code, Section 1320a-7b(b) and are subject to forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(C).

5.     Finally, this affidavit is submitted in part for the limited purpose of establishing probable cause to support applications for the issuance of warrants to search Sacred Heart Hospital and its administrative and record storage facilities, which are described in greater detail in Attachments A through C, for evidence and instrumentalities relating to violations of: (A) the federal anti-kickback statute (Title 42, United States Code, Section 1320a-7b(b)); and (B) the federal health care fraud statute (Title 18, United States Code, Section 1347) in connection with schemes involving Sacred Heart executives, administrators, physicians, employees, and associated individuals to defraud federal health care benefit programs by billing for services for which payment is not authorized, because (A) the services rendered to the patient were not medically necessary, and/or (B) the patients to whom the services were provided were referred to the treating provider in return for the payment of an unlawful kickback.

6.     Because this affidavit is submitted only for these limited purposes, it does not set forth each and every fact that I know about this investigation.

III.    **Summary of the Investigation**

   A.    **The Sacred Heart Schemes**

   7.    The FBI is investigating individuals associated with Sacred Heart, an acute care hospital located on Chicago's west side. As described in detail below, the investigation has revealed that the defendants and others have conspired to offer and pay, and solicit and receive, kickbacks in return for the referral of patients insured by Medicare and Medicaid.

   8.    The investigation has further revealed that certain Sacred Heart executives, administrators, and physicians are engaged in a scheme to defraud Medicare and Medicaid by submitting and causing the submission of claims and the presentment of hospital cost reimbursement reports seeking payment for emergency care evaluation, testing and observation services that are not medically necessary.

   9.    Finally, the investigation has revealed that certain Sacred Heart executives, administrators and physicians are engaged in a scheme to defraud Medicare and Medicaid by submitting and causing the submission of claims and the presentment of hospital cost reimbursement reports seeking payment for the sedation, intubation, and subsequent performance of tracheotomy procedures on patients absent the medical necessity to perform these procedures.

4

## B.    The Government's Cooperating Sources

10.    In October 2011, Physician A, who, at the time, served as Sacred Heart's chairman of emergency room operations, agreed to cooperate with the government's investigation.[3]  According to the Illinois Department of Financial and Professional Regulation's website, Physician A has been licensed to practice medicine in Illinois since 1995.  Physician A has assisted the government's investigation by providing historical information about Sacred Heart's operations and by making consensual recordings of meetings with Sacred Heart executives and physicians, some of which are described in greater detail below.[4]

11.    In February 2012, Administrator B, who is employed as a member of Sacred Heart's senior executive staff, agreed to cooperate in the government's investigation.  According to Administrator B, her responsibilities at Sacred Heart include overseeing medical clinics associated with the hospital as well as managing the hospital's marketing staff and transportation services.  Administrator B has explained

---

[3]    Physician A was terminated from Sacred Heart in or about March 2012.

[4]    Prior to agreeing to cooperate in this investigation, Physician A was recorded accepting a kickback in return for referring Medicare-insured patients to a home health care company not affiliated with Sacred Heart.  In his interviews with law enforcement agents, which were subject to the terms of a proffer agreement, Physician A admitted to accepting cash payments (totaling thousands of dollars) for the referral of patients to these home health care agencies.  In his initial interviews, Physician A made certain statements which he has subsequently acknowledged were not accurate.  Other than the proffer agreement, the government has not made any promises or assurances to Physician A in connection with his assistance in this and other investigations.  Physician A is cooperating with the hope that his cooperation will be considered in any charging decisions made against him and, if he is charged and convicted of a crime, by a court at the time of sentencing.  Physician A has never been arrested or convicted of a crime.

5

that she reports directly to Administrator A and, ultimately, to Edward Novak, the hospital's owner and Chief Executive Officer.

12.     Investigating agents first approached Administrator B concerning allegations that she was soliciting kickbacks for the referral of durable medical equipment and pharmaceutical prescriptions ordered for patients insured by Medicare. Administrator B acknowledged her solicitation and receipt of kickbacks and agreed to cooperate with the government's investigation.[5]

13.     At investigating agents' request and direction, Administrator B has consensually recorded a number of meetings and telephone calls with Sacred Heart executives, administrators, physicians and employees.[6]

---

[5] Prior to agreeing to cooperate in the investigation, Administrator B was consensually recorded offering to pay kickbacks for the referral of Medicare patients to Sacred Heart. Administrator B was also recorded accepting payments from a confidential source in return for her referral of prescriptions for Medicare and Medicaid patients to a durable medical equipment supply company. In interviews with investigating agents, which were subject to the terms of a proffer agreement, Administrator B admitted accepting cash payments (totaling thousands of dollars) and other compensation for pharmaceutical and durable medical equipment referrals. Administrator B further admitted accepting cash payments (totaling thousands of dollars) for referring Medicare patients to home health care agencies not affiliated with Sacred Heart. In her interviews, Administrator B has made certain statements which she has subsequently acknowledged were not accurate. Other than the proffer agreement, the government has not made any promises or assurances to Administrator B in connection with her assistance in this investigation. Administrator B is cooperating with the hope that her cooperation will be considered in any charging decisions made in connection with this investigation and, if Administrator B is charged and convicted, by a court at the time of sentencing. Administrator B has never been arrested or convicted of a crime.

[6] With Administrator B's consent, the government obtained judicial authorization pursuant to 18 U.S.C. § 2511(2)(a)(ii)(A) to record the communications to and from a cellular telephone used by Administrator B. Pursuant to that authorization, law enforcement consensually recorded communications to and from Administrator B's cellular telephone from in or around March 3, 2012, through in or around September 15, 2012.

14.     In January 2013, Administrator A, who is also employed as a member of Sacred Heart's senior executive staff, agreed to cooperate in the government's investigation.[7] Administrator A has described his responsibilities at Sacred Heart to include: (1) general oversight of the hospital's operations; (2) increasing patient admissions to the hospital by recruiting physicians willing to refer Medicare-insured patients to the hospital in return for kickbacks; and (3) instituting and maintaining processes that facilitate the admission of paid-for patient referrals to the hospital. According to Administrator A, he takes direction from and reports directly to Novak.

15.     At investigating agents' request and direction, Administrator A has assisted in the investigation by, among other things, making consensual video and audio recordings of in-person and telephone conversations with other Sacred Heart

---

[7] Prior to agreeing to cooperate in the investigation, Administrator A was consensually recorded offering to pay, and in at least one instance, paying kickbacks, to physicians in return for their referral of patients to Sacred Heart. Administrator A was also consensually recorded directing that Sacred Heart physicians not interfere with the admission of other physicians' patient referrals to Sacred Heart, irrespective of the perceived lack of medical necessity for those admissions. Administrator A was further recorded directing physicians and others to use the hospital's emergency room unnecessarily to observe and admit patients to Sacred Heart. Administrator A's interviews with law enforcement agents were subject to the terms of a proffer agreement. In those interviews, Administrator A has made certain statements which he has subsequently acknowledged were not accurate. Other than the proffer agreement, the government has not made any other promises or assurances to Administrator A in connection with his assistance in this investigation. Administrator A is cooperating with the hope that his cooperation will be considered in any charging decisions made in connection with this investigation and, if Administrator A is charged and convicted, by a court at the time of sentencing. Administrator A has never been arrested or convicted of a crime.

executives, administrators, physicians, and employees, some of which are described below.[8]

## IV. The Federal Health Care Benefit Programs and the Prohibition Against Kickbacks and Fraudulent Billing

16.     The Medicare program is a federally-funded health care benefit program that provides free or below-cost health care benefits to certain eligible individuals, primarily the elderly, blind and disabled. Medicare is administered by the Centers for Medicare and Medicaid Services, known as CMS, an agency of the United States Department of Health and Human Services. Individuals who receive benefits under Medicare are often referred to as Medicare beneficiaries.

17.     The portion of the Medicare program known as Medicare Part A pays for certain inpatient care services provided to beneficiaries, including hospital care. The portion of the Medicare program known as Medicare Part B pays for certain physician and outpatient services provided to beneficiaries.

18.     To receive reimbursement from Medicare for services provided to its insureds, hospitals and physicians must sign a provider agreement that establishes their eligibility. The standardized Medicare Part A agreement provides that the proposed provider agrees "[t]o abide by the Medicare laws, regulations and program instructions that apply to [it]." The agreement further provides "that payment of a

---

[8] With Administrator A's consent, on or about February 21, 2013, and March 21, 2013, the government obtained judicial authorization pursuant to 18 U.S.C. § 2511(2)(a)(ii)(A) to record the communications to and from a cellular telephone used by Administrator A. Law enforcement has consensually recorded communications to and from that cellular telephone since about February 22, 2013.

claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the [provider's] compliance with all applicable conditions of participation in Medicare." The Medicare Part B enrollment application requires the provider to attest: "I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity."

19.    The Medicaid program is a federally assisted grant program that enables states to provide medical assistance and related goods and services to needy individuals (*i.e.*, Medicaid beneficiaries). The State of Illinois participates in the Medicaid program through the Illinois Department of Healthcare and Family Services, which receives approximately fifty percent of its Medicaid funds from the federal government. CMS administers the federal government's participation in the Medicaid program. Within broad federal rules established by CMS, each state establishes criteria determining who is eligible for Medicaid coverage, what services are covered by the program, and the reimbursement rates for covered services. In general, states directly pay Medicaid-enrolled providers for services delivered to Medicaid beneficiaries with funding obtained, in part, from the United States government, namely, from accounts that draw on funds of the United States Treasury.

9

20.     Medicare and Medicaid constitute health care benefit programs as defined by Title 18, United States Code, Section 24(b) and federal health care programs as defined by Title 42, United States Code, Section 1320a-7b(f)(1).

21.     I am aware that Title 42, United States Code, Section 1320a-7b(b), which is commonly referred to as the federal health care anti-kickback statute, prohibits the solicitation and receipt as well as the offer and payment of "remunerations (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind . . . in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program."

22.     I am further aware that pursuant to Title 18, United States Code, Sections 981(a)(1)(c) and 981(b)(1)&(2) that any property which constitutes or is derived from proceeds traceable to a violation of a Federal health care offense is subject to seizure and forfeiture.

23.     Through my training and experience, I am also generally aware that both Medicare and Medicaid only reimburse health care providers, including hospitals and physicians, for services and items that are medically necessary.

### V.     The Sacred Heart Kickback Conspiracy

#### A.     Sacred Heart Executives Edward Novak and Roy Payawal

24.     According to public records, insurance registration materials, claims data, and information provided by cooperating witnesses, since the late 1990s, Edward Novak has owned and served as the CEO of Sacred Heart Hospital, a 119-bed short-term, acute care hospital located at 3240 West Franklin Boulevard in Chicago, Illinois. Beginning no later than the early 2000s, Roy Payawal has served as the Executive Vice President of Finance and Chief Financial Officer of Sacred Heart. Sacred Heart provides health care services to patients insured by Medicare, Medicaid, and private insurance companies.

25.     In their respective interviews with law enforcement, Administrators A and B explained that Sacred Heart, at the direction and with the approval of Novak, and assistance of Payawal, implemented a scheme to offer and pay kickbacks to physicians in return for the referral of patients receiving health care services, including patients insured by Medicare and Medicaid. Administrators A and B have further explained that Novak and Payawal have sought to conceal Sacred Heart's patient referral payments through various means, including: masking the payments as fictitious rental payments (*i.e.*, have the hospital "sub-lease" space from physicians without utilizing that space); paying the salaries of physicians' employees (*e.g.*, paying physicians' assistants); providing physicians with ghost contracts (*e.g.*, medical directorships without responsibilities); creating alternative insurance billing arrangements (*e.g.*, billing a physician's professional services under a different

physician's provider number); and arranging for physicians to participate in paid medical training programs (*i.e.*, supervising and teaching non-existent medical students). According to Administrator A, Novak has personally negotiated and/or approved of the payments-for-patients arrangements made by the hospital and the manner in which those payments are made.[9]

26. Administrators A and B advised that Novak has aggressively solicited physicians capable and willing to refer patients to Sacred Heart, including patients insured by Medicare. Administrators A and B stated that Novak has pressured them to recruit physicians willing to refer patients to the hospital in return for kickbacks. According to Administrators A and B, in the fall of 2012, Novak hired an in-house recruiter whose primary responsibility was to solicit physicians who could refer their patients for admission to the hospital.

---

[9] In addition to kickbacks paid to physicians, Sacred Heart provides kickbacks to patient recruiters. According to Administrator B, Sacred Heart employs three to five "marketers" paid to solicit Medicare and Medicaid insured patients. The salaries for these marketers, who Administrator B manages, are based on the volume of their patient referrals. According to Administrator B, if a marketer does not meet her quota, Novak directs Administrator B to threaten to fire or ultimately fire the marketer. Administrator B has also explained that Sacred Heart employs a fleet of vans to drive patients to and from the hospital. Administrator B manages the drivers. According to Administrator B, Sacred Heart pays the drivers for individual patient referrals. On April 24, 2012, Administrator B consensually recorded a meeting with Administrator A and Payawal in which Administrator B asked if she could compensate drivers for referring patients to the hospital. Administrator A, who was not then aware of the government's investigation, agreed to pay the drivers $20 per patient and Payawal told Administrator B how to order checks for the drivers from his department. Sacred Heart also uses the its patient clinics to generate hospital admissions. In a March 23, 2012 telephone call consensually recorded by Administrator B, Novak stated that the hospital needed to increase its census and inquired which physicians working at one of the clinics were referring admissions to the hospital that day. Later the same day, Novak called Administrator B again to ask about the day's admission numbers and to assert that he wanted the hospital to "g[e]t some pathology [*i.e.*, sick patients] out of [the clinic]."

27.    Administrators A and B advised that Sacred Heart's efforts to recruit physicians willing to sell their patient referrals to the hospital were openly discussed among the hospital's executive staff.  Administrator B advised that the hospital's executive committee discussed these efforts as regular topics in its weekly meetings. For example, on April 10, 2012, Administrator B consensually recorded a meeting with Payawal and Administrator A in which Administrator B inquired about the types of "incentives" Sacred Heart could offer prospective referring physicians.  Payawal and Administrator A identified fictitious rental agreements as one such method.

28.    Administrators A and B told investigating agents that, as Sacred Heart's CFO, Payawal is responsible for overseeing Sacred Heart's finances, including the hospital's payroll and accounts payable.  Administrator A has explained that, in this role, Payawal directly and through his staff is responsible for generating kickback checks, accounting for the payments in the hospital's books and records, and maintaining the paperwork necessary to justify the purported reasons for the payments.  Administrators A and B have told investigating agents that Payawal is apprised of the various payment-for-patient arrangements authorized by Novak as well as the means used to conceal those payments.

29.    Payawal's staff is also responsible for tracking physicians' patient referrals.  Administrators A and B explained that hospital employees who report to Payawal tabulate daily patient referral logs into weekly computer generated reports that identify Sacred Heart's patient sources.  These spreadsheets are then disseminated to Sacred Heart's executives, including Novak.  According to

Administrators A and B, Novak uses these reports to monitor the number of referrals from doctors receiving payments and to ensure those doctors are meeting their paid-for referral obligations.

30.    In addition to discussing physician recruitment, Novak and Payawal have had a number of conversations with Administrator A concerning the manner in which Sacred Heart should distribute its existing kickback obligations to physicians.  For example, in a February 14, 2013 telephone conversation consensually recorded by Administrator A,  Administrator A told Novak that he had recently withheld a kickback payment from a referring physician because that physician had failed to attend certain committee meetings and failed to provide purported reports that were to conceal the true reason for the payments provided to him. In response, Novak stated that Administrator A could not simply withhold payment from a doctor. "[Y]ou cannot stop a guy's check without talking to the guy. . . .  Tell him to come in.  Have him always come in and pick up his fucking check. . . .  It's face-to-face.  You have a relationship then."  Novak stated that the person-to-person payments he proposed would further ensure the "loyalty" of the physician recipients.   Novak added, "And every month he's got to come in and pick up the fucking check. Sign the paperwork, people know who he is."[10]  Novak explained that by requiring physicians to come into

---

[10]   Novak amended this instruction following an unannounced early March 2013 investigation by CMS and State of Illinois surveyors at Sacred Heart. In particular, following that inquiry, Novak instructed Administrator A that he should withhold future payments from the same referring physician if he did not produce reports to evidence his alleged service, thereby justifying his compensation.

Sacred Heart to retrieve their payments, the hospital would remind the doctors of the importance of being seen in the hospital and providing paperwork consistent with the payments they were to receive.

31.     As set forth in Sections B through E below, Novak and Payawal have directed that payments be made to Dr. Percy Conrad May, Jr., Dr. Shanin Moshiri, Dr. Subir Maitra, and Dr. V.R. Kuchipudi, in return for patient referrals from these physicians.

32.     During a February 28, 2013 meeting that was held in Administrator A's office, and which was consensually recorded by Administrator A, Novak, Payawal and Administrator A discussed the particular physicians to whom Administrator A should personally deliver kickback payments.  Novak and Payawal identified May, Moshiri, and Maitra as physicians receiving regular kickback payments that Administrator A should pay.  In discussing the payments, Novak reminded both Administrator A and Payawal that, in connection with those payments, Sacred Heart had "to make sure that these guys are filling out [the] forms" that were to conceal the actual reasons for the payments the hospital provided.  On March 1, 2013, during a consensually recorded conversation, Administrator A asked Payawal why Novak wanted him temporarily to withhold certain doctors' checks.  Payawal responded, "To get more business."

33.     Administrator A subsequently asked Payawal to have Sacred Heart's accounts payable department forward to Administrator A the hospital's kickback checks before they were provided to the referring physicians.  Payawal agreed.  And,

15

as instructed by Novak, beginning in early March 2013, Administrator A began hand-delivering Sacred Heart kickback payments to various physicians.

34.     Novak repeated his request that kickback payments to physicians be concealed during a March 11, 2013 consensually recorded conversation with Administrator A in Novak's office. Novak told Administrator A that: "[W]e got to make sure that all of our contracts with all of our doctors are fine. . . . [W]e got to go through every one of them to make sure that they are doing what they are supposed to be doing and we got a paper trail on all this shit – They are signing off on this and that. We don't want any problems." Administrator A has told investigating agents that he understood Novak to mean that he wanted Administrator A to ensure that there was sufficient paperwork to conceal the true nature of the kickback payments Sacred Heart paid to physicians.

35.     On March 13, 2013, Novak repeated his point regarding concealing kickback payments to physicians during a consensually recorded meeting with Administrator A in Novak's office. Novak reiterated that he wanted Administrator A to "get all these contracts together. . . . Let's make sure they are kosher. . . . Maybe have what's her name [i.e., outside counsel] to review them. We got to be adhering to them." Later in the same conversation, Novak clarified: "So, you know, it is stuff like that. Just keep us kosher. You know, that's all just to cover our asses." Administrator A understood Novak's statement to be that the hospital needed to ensure that the physicians took sufficient steps to make the contracts appear legitimate, even though they were not.

**B.    Dr. Percy Conrad May, Jr.**

36.    According to the Illinois Department of Financial and Professional Regulation's website, Percy Conrad May, Jr. is a physician who has been licensed to practice medicine in Illinois since 1962. According to cooperating source reporting and Medicare claims data, May has privileges and has treated patients at Sacred Heart.

37.    In July 2007, May executed an application to enroll as a provider in the Medicare program. As part of that application, May signed a certification statement in which he attested that he "agree[d] to abide by the Medicare laws, regulations and program instructions that apply to [it]," and that he understood that "that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the [provider's] compliance with all applicable conditions of participation in Medicare."

38.    According to Administrator A, in or around the spring of 2012, he learned that Sacred Heart was paying May $2,000 per month under a purported "rental agreement" that was crafted by Administrator A's predecessor and Payawal to mask kickback payments provided to May in exchange for his patient referrals to Sacred Heart. To Administrator A's knowledge, Sacred Heart never used any of May's office space for which Sacred Heart paid the purported "rent." Administrator A explained that in the Spring of 2012, Novak told him that May was not referring sufficient numbers of patients to Sacred Heart despite the hospital's $2,000 per month payment. During this meeting, Novak provided Administrator A with a check for May. Novak

17

instructed Administrator A to give May the check and to tell him to increase his referrals. Novak told Administrator A to inform May that if he did not refer additional patients to Sacred Heart, the hospital would terminate the monthly payments.

39.     On April 10, 2012, Administrator B had a consensually recorded meeting with Administrator A and Payawal during which she inquired about the types of "incentives" Sacred Heart could offer prospective referring physicians. In response to Administrator B's inquiry, Payawal and Administrator A identified the payments, concealed as rent, that Sacred Heart was then providing May. Administrator A noted that the hospital was then paying May $2,000 a month, but was not receiving a sufficient rate of patient referrals in return. Payawal explained that May had referred a greater number of patients when Sacred Heart was paying May $5,000 a month, but that his admissions had decreased when the hospital's payments to him were reduced to $2,000 by Administrator A's predecessor: "We were paying him five thousand and he's getting payroll here. When [Administrator A's predecessor] reduced it to two thousand, that's when he [May] dried up. We were paying five thousand before we were getting five or six referrals a month. He got upset when, ah, cut the, yeah, he lost three thousand." Payawal stated that the decision to reduce May's payments had backfired. He suggested, however, that May might be interested "to expand his firm

18

because he called Novak," which Administrator A confirmed, stating that May "was here recently . . . about a week ago."[11]

40.     Later during the same April 10, 2012 meeting, Administrator A asked Administrator B to set up a meeting with May so they could "understand what it will take" to get May to admit more patients to Sacred Heart, noting that May appeared to have a "very robust practice." Administrator A stated "we have a rental agreement with him" and "we have to find out what it will take to re-direct admissions" to Sacred Heart. Administrator A asked aloud to the group: "Would it take us renting more space? Some other relationship he's looking for?" Payawal reiterated that the problems with May's admissions started "when we cut the rent." He explained: "It's human nature. If you cut my salary by fifty percent, I'm going to slow down. . . . Once you give a benefit it's tough to take it away."

41.     On May 23, 2012, Administrator B met with Administrator A and May at Sacred Heart and consensually recorded their meeting. May explained that fifty percent of his Medicare patients were insured by Medicare health maintenance organizations, which allowed May to collect reimbursement for conducting pathology tests that Medicare otherwise would not pay.[12] Administrator A asked May what they

---

[11]   According to Administrator B, when Sacred Heart previously paid May $5,000 per month in purported rent, Sacred Heart had a podiatrist stationed at May's clinic to see patients. After Administrator A's predecessor at Sacred Heart cut the rent payment to $2,000, May reduced his admissions to Sacred Heart, and the podiatrist left May's clinic.

[12]   Based on my training and experience, I am generally aware that a Medicare beneficiary may elect to participate in an HMO plan, which may reduce the beneficiary's Part B premiums, but limit the physicians and facilities available to the beneficiary for treatment.

19

needed to do to get May to admit more patients to Sacred Heart. May stated that he could not send his HMO-insured patients to Sacred Heart because the hospital was not an approved provider in the HMO plans in which he was a participant-provider. Administrator B provided May with a $2,000 check and asked May if he would be willing to admit more patients to Sacred Heart. May said he would try.

42.     Administrator B met with Administrator A and May at Sacred Heart again on September 7, 2012. The meeting was consensually recorded. Before May arrived, Administrator A outlined an agenda for the meeting. Administrator A explained that he, once again, had May's monthly "rental" check. Administrator A noted, however, that May's admissions had not increased since their last meeting, but that since that time, the hospital had joined multiple HMO networks. Accordingly, Administrator A told Administrator B: "We want all the admissions to come here. He's getting $2,000 a month. Here's his check. And in exchange for continuing this relationship, it's a quid pro quo. We expect admissions to be sent to Sacred Heart. . . . That's going to be the message that we send to him." When May arrived, Administrator A told May that the hospital had joined several HMO networks and asked if May could therefore increase his admissions to the hospital. May stated that since the HMO network impediment had been resolved, referring patients to Sacred Heart would no longer be a problem.

43.     In subsequent interviews, Administrator A expressed that he pressured May at Novak's direction to provide Sacred Heart additional patient referrals in return for the fictitious lease payments that the hospital was providing May in the fall of

2012. In particular, Administrator A has explained that, at Novak's instruction, Administration A was responsible for ensuring that physicians were providing their paid-for patient referrals.

44. In February 2013, Novak asked Administrator A to personally deliver Sacred Heart checks to certain doctors receiving kickback payments in exchange for their patient referrals. On February 28, 2013, Administrator A had consensually recorded conversations with Novak and Payawal concerning the delivery of those kickback payments. In particular, Administrator A consensually recorded a telephone conversation with Payawal in which Administrator A asked Payawal to confirm those doctors to whom Sacred Heart made payments "for rent." Payawal identified May as one of those doctors. At Administrator A's request, Payawal agreed to provide certain physicians' checks, including May's, for Administrator A to deliver to their recipients.

45. Shortly thereafter, Administrator A met with Novak and Payawal in Administrator A's office. During the meeting, which was consensually recorded, Administrator A told Novak and Payawal that he would deliver May's check. Despite these February 28, 2013 conversations, Administrator A never received an additional check to provide to May.

46. Based on records from Sacred Heart's operating accounts at Fifth Third Bank and First Merit Bank, between January 2010 and February 2013, Sacred Heart issued approximately 37 checks for $2,000 each, totaling approximately $74,000 to May

21

in the name of May Medical Center.[13]  Novak and Payawal signatures appear on each check.  Based on the foregoing, I believe that Sacred Heart's payments to May were kickbacks in exchange for May's referral of patients to Sacred Heart.

### C.    Dr. Shanin "Shawni" Moshiri

47.    According to the Illinois Department of Financial and Professional Regulation's website, Shanin Moshiri is a podiatrist who has been licensed to practice podiatric  medicine  in  Illinois  since  1987.    According  to  the  website www.chicagofootclinic.com, last checked on April 10, 2013, Moshiri is one of two physicians practicing at Chicago Foot Clinic, Ltd., which has its primary location at West Cermak Road in Chicago, Illinois.  Cooperating source reporting and Medicare claims data show that Moshiri has privileges and treats patients at Sacred Heart.

48.    In November 2012, Moshiri executed an application to revalidate his enrollment as a provider in the Medicare program. As part of that application, Moshiri signed a certification statement in which he attested that he "agree[d] to abide by the Medicare laws, regulations and program instructions that apply to [it]," and that he understood that "that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the [provider's] compliance with all applicable conditions of participation in Medicare."

---

[13]  According to the Illinois Department of Financial and Professional Regulation's website, May's primary office is located at 3857 W. Washington, Chicago, IL 60624.

49.     According to Administrator A, Sacred Heart established an arrangement, prior to Administrator A's employment at Sacred Heart, to pay Moshiri $2,000 a month, pursuant to an alleged contract to teach podiatry students at the hospital. Administrator A further explained that he reviewed the Moshiri contract in the course of his duties at Sacred Heart.  For the reasons set forth below, Administrator A understands that the contract with Moshiri was designed solely to conceal kickback payments provided to Moshiri in exchange for his referral of patients to Sacred Heart.

50.     In early April 2013, Administrator A provided a copy of the Sacred Heart – Moshiri contract to investigating agents.   That contract reflects that Administrator A's predecessor, on behalf of Sacred Heart, and Shawni Moshiri, on behalf of Chicago Foot Clinic, executed the alleged agreement on September 1, 2008.[14] Pursuant to the purported terms of the contract, Moshiri agreed, among other things, to supervise podiatry students at Sacred Heart.  In exchange for those alleged services, Sacred Heart agreed to pay Moshiri $4,000 a month.  Pursuant to a letter issued by Administrator A's predecessor, the contract was amended on March 12, 2010, to reduce the amount Sacred Heart agreed to pay Moshiri to $2,000 per month.  The contract still required the supervision of podiatry students.   To Administrator A's knowledge, Moshiri has never supervised podiatry students at Sacred Heart.

---

[14]  The website for Chicago Foot Clinic includes a photograph identified as Shanin Moshiri.  Investigating agents have shown a copy of that photograph to Administrator A, who identified the photograph of Shanin Moshiri as the individual he knows as Shawni Moshiri.

51.     According to Administrator A, in or around November 2012, he met with Novak to discuss Sacred Heart's kickback payments to various physicians, including Moshiri.     During that meeting, Novak told Administrator A that he wanted Administrator A to personally deliver certain kickback payments, including a check to be provided to Moshiri.  Novak further instructed Administrator A to tell Moshiri that Sacred Heart wanted to see more patient referrals from him.     As instructed, Administrator A delivered a Sacred Heart check to Moshiri in or around November or December 2012, and asked Moshiri to refer additional patients to Sacred Heart.  At no point did Moshiri discuss the supervision of podiatry students at Sacred Heart.  After delivering Moshiri's check to him, Administrator A instructed his assistant to mail future checks to Moshiri.

52.     On or before February 17, 2013, Novak again directed Administrator A to deliver Moshiri's kickback payments in person.  Accordingly, on February 17, 2013, Administrator A made a consensually recorded telephone call to Moshiri.  During their conversation, Moshiri told Administrator A that he had already received a call from Novak's assistant instructing him to pick up his check from the hospital. Administrator A confirmed that Novak wanted Moshiri to come to Sacred Heart to retrieve the check.  Moshiri, in turn, responded that he did "seven cases" at Sacred Heart in January 2013 and could get a list for Novak.

53.     On the morning of February 20, 2013, Administrator A had a consensually recorded meeting with Payawal in Payawal's office at Sacred Heart.  During their meeting, Payawal told Administrator A that Novak had called him yesterday and

24

asked how much Sacred Heart was paying Moshiri. Payawal advised Novak that the hospital was paying Moshiri $2,000 a month. According to Payawal, Moshiri had complained to Novak about not receiving his check on time. Payawal explained that Novak had therefore suggested that Administrator A hand deliver the checks to Moshiri. When Administrator A inquired why, Payawal said that Novak wanted Administrator A to ask Moshiri something to the effect: "How come you haven't got referrals?" or "how come you haven't been to surgery and so forth?"

54. As instructed, on February 21, 2013, Administrator A had a consensually recorded telephone conversation with Moshiri to let him know that he had Moshiri's monthly check. During their conversation, Moshiri told Administrator A that Moshiri would stop by the following day to pick up the check. Administrator A told Moshiri that Novak had asked that Administrator A hold Moshiri's check and had inquired about Moshiri's business at Sacred Heart. At no time during this discussion did Moshiri reference the supervision of podiatry students at Sacred Heart.

55. As arranged, Administrator A met with Moshiri in Administrator A's office at Sacred Heart on February 22, 2013. The meeting was consensually recorded. During the meeting, Administrator A handed Moshiri the $2,000 check that "Novak wanted" Moshiri to have. Moshiri told Administrator A that he has a "multi-faceted business with [Sacred Heart]." In particular, Moshiri explained that he used Novak's medical malpractice insurance company, Bentley Insurance, and referred patients to Novak's home health company, Superior Home Health. Moshiri asked Administrator A, "What else do you we want me to do? . . . I am doing everything here,

25

with this organization [Sacred Heart]." Moshiri then handed Administrator A a list of surgeries that he had performed in January 2013 at Sacred Heart. Administrator A promised to convey the information provided by Moshiri to Novak. At no time did Moshiri discuss the supervision of podiatry students at Sacred Heart.

56.     Administrator A met with Novak in Administrator A's Sacred Heart office later that day to discuss, among other things, his recent meeting with Moshiri. The meeting was consensually recorded. During their conversation, Administrator A told Novak that he had just met with Moshiri, and that Moshiri had provided Administrator A with a list of surgeries Moshiri had performed at Sacred Heart in January. Reviewing the list, Novak responded: "So what . . . five cases in a month?" Administrator A asked if he should ask Moshiri to bring more cases to the hospital, to which Novak responded, "No, just let it be."

57.     As previously described, Administrator A recorded a meeting that he had with Payawal in Administrator A's office on February 28, 2013 concerning the kickback payments that Sacred Heart was then providing to various physicians. During that meeting, Administrator A told Payawal that Novak wanted Administrator A to hand deliver the checks to the doctors that "have all these agreements in place." Administrator A told investigating agents that he was referring to the doctors that had contractual agreements with Sacred Heart to conceal the kickback payments paid by the hospital in exchange for the physicians' patient referrals. Payawal told Administrator A that Payawal and Novak had discussed the need for Administrator A to deliver Moshiri's $2,000 check.

26

58.     Later on February 28, 2013, Administrator A had a consensually recorded conversation with Payawal during which Administrator A asked Payawal to confirm those doctors paid by Sacred Heart "for teaching." Payawal provided Administrator A with the names of several doctors, including that of Moshiri. Within hours, Administrator A met with Novak and Payawal to discuss again the payment of kickbacks to physicians. Administrator A told Novak that he would deliver Moshiri's check to him.

59.     On or before March 8, 2013, Administrator A received a Sacred Heart check to deliver to Moshiri. Administrator A photographed the check, and provided an image of the check to investigating agents. The check, which is made payable to Chicago Foot Clinic, Ltd., Shawni Moshiri, DPM is dated March 1, 2013, bears check number 35124, and is drawn on Sacred Heart's operating account at First Merit Bank. The check bears the signatures of Novak and Payawal.

60.     In the early afternoon of March 8, 2013, Administrator A received a telephone call from Moshiri, which Administrator A consensually recorded. During the call, Moshiri asked Administrator A if he could stop by Sacred Heart and pick up the check, to which Administrator A agreed. Moshiri arrived at Administrator A's office shortly thereafter. During the consensually recorded meeting, Administrator A handed Moshiri the March 1, 2013, check which was enclosed in an envelope. Moshiri looked at the envelope, folded it, and placed it inside of his coat. During their conversation, Administrator A explained that he had provided Moshiri's list of surgeries to Novak. Moshiri asked how Novak had responded. Administrator A responded that Novak had

27

asked Administrator A not to repeat what Novak had said. Moshiri asked if Novak did not like the list. Administrator A responded that Moshiri would know better than Administrator A. Moshiri complained that Novak wants "the Taj Mahal. All or nothing." Moshiri explained that "Novak should be very happy I bring my patients here [to Sacred Heart]." Moshiri claimed that he is "the most active Podiatrist in the Department of Podiatry in this hospital. And if there are no patients, what do you want me to do? Six, seven patients per month from one Podiatrist [Moshiri] is a lot." Administrator A asked Moshiri "how long have you been bringing the patients here?" Moshiri responded "a couple of years" and offered to bring Administrator A documentation of all of his patient referrals to Sacred Heart. At no point did Moshiri discuss the supervision of podiatry students at Sacred Heart.

61. Based on records from Sacred Heart's operating accounts at Fifth Third Bank and First Merit Bank, between January 2010 and March 2013, Sacred Heart issued approximately 38 checks totaling approximately $86,000 to Moshiri in the name of Chicago Foot Clinic, Ltd., Shawni Moshiri, DPM, P.O. Box 11232, Chicago, IL 60611.[15] The signatures of Novak and Payawal appear on each check. Based on the foregoing information, I believe that Sacred Heart's payments to Moshiri were kickbacks in exchange for Moshiri's referral of patients to Sacred Heart.

---

[15] According to the Fifth Third bank records, the Sacred Heart checks for January, February, March, April, and May 2010 were in the amount of $4,000. According to the Fifth Third and First Merit Bank records, the remaining Sacred Heart checks were in the amount of $2,000.

### D.  Dr. Subir Maitra

62.  According to the Illinois Department of Financial and Professional Regulation's website, Subir Maitra is a physician who has been licensed to practice medicine in Illinois since 1975. Cooperating source reporting and Medicare claims data show that Maitra has privileges at Sacred Heart, and performs urological procedures on patients there.

63.  On February 5, 2010, Maitra executed an application to enroll as a provider in the Medicare program. As part of that application, Maitra signed a certification statement in which he attested that he "agree[d] to abide by the Medicare laws, regulations and program instructions that apply to [it]," and that he understood that "that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the [provider's] compliance with all applicable conditions of participation in Medicare."

64.  According to Administrator A, Sacred Heart established an arrangement, prior to Administrator A's employment at Sacred Heart, to pay Maitra $2,000 a month, pursuant to an alleged contract to teach medical students at the hospital. Administrator A further explained that he reviewed the Maitra contract in the course of his duties at Sacred Heart. For the reasons set forth below, Administrator A understands that the contract with Maitra was designed solely to conceal kickback payments provided to Maitra in exchange for his referral of patients to Sacred Heart.

29

65.    Administrator A reviewed Maitra's contract in the course of his Sacred Heart duties. Administrator A explained that the contract was executed in June 2010 and renewed in May 2011. In early April 2013, Administrator A provided a copy of Maitra's Sacred Heart contract to investigating agents. The contract reflects that it was executed by Novak and Maitra on June 1, 2010. Pursuant to its alleged terms, Maitra is to serve as a member of the teaching and consulting faculty of Sacred Heart's "Medical Student Program." The contract further provides that Maitra agreed to permit Sacred Heart's medical students to observe his medical practice at Sacred Heart. In exchange for the foregoing, the contract reflects that Sacred Heart would pay Maitra $2,000 a month. To Administrator A's knowledge, Maitra has never taught medical students at Sacred Heart.

66.    According to Administrator A, in November 2012, Novak met with Administrator A to discuss Sacred Heart's kickback payments to Maitra. Novak told Administrator A that Sacred Heart could not pay Maitra for "nothing." Novak therefore instructed Administrator A to make sure that there was sufficient paperwork in Sacred Heart's Maitra file to reflect that he was teaching students at the hospital. Administrator A subsequently spoke to Payawal, who assured Administrator A that the requisite paperwork was included within Maitra's file. Although Administrator A has never reviewed those documents, Administrator A knows that any such paperwork would be fraudulent because to Administrator A's knowledge, Maitra has not taught and is not teaching medical students at Sacred Heart.

67.     During the same November 2012 meeting with Novak, Novak instructed Administrator A to deliver personally Sacred Heart's kickback payments to Maitra. In doing so, Novak instructed Administrator A to tell Maitra that Sacred Heart wanted to see more patient referrals from him. According to Administrator A, as instructed, in or around November or December 2012, he hand delivered Maitra's monthly kickback check and asked Maitra to refer more patients to Sacred Heart. At no time did Maitra discuss the teaching of medical students at Sacred Heart. After delivering Maitra's check to him, Administrator A instructed an administrative assistant to mail future checks to Maitra.

68.     In the previously referenced February 28, 2013 consensually recorded telephone conversation between Administrator A and Payawal, Administrator A also asked Payawal to identify those doctors that Sacred Heart was paying "for teaching." Payawal, again, provided Administrator A with the names of several doctors, including Maitra.  Administrator A asked Payawal to send him the kickback checks for subsequent in-person distribution, to which Payawal agreed.  When Administrator A met with Novak and Payawal in their consensually recorded meeting later that morning, Administrator A told Novak and Payawal that he would personally deliver the check to Maitra.

69.     Later on February 28, 2013, Administrator A met with Maitra in Administrator A's office at Sacred Heart. The meeting was consensually recorded. During their meeting, Administrator A asked Maitra if everything was okay. Maitra responded "no, it's not." Maitra went on to complain that he had "a patient with good

31

insurance and [Sacred Heart] transportation did not go and pick up the patient."
Maitra explained that "these patients, the moment the transportation doesn't come,
they go back to work." Administrator A understood this to mean that if not timely
transported to the hospital, Maitra's patients would not undergo the procedures that
he planned to perform on them. Maitra told Administrator A that if Sacred Heart fails
to transport the patients, he will not bring his insurance patients to Sacred Heart.
Maitra points out to Administrator A "that [the claims brought in by serving insurance
patients] is big money and you don't want to lose those [insurance] patients."

70. During the same conversation with Maitra on February 28, 2013,
Administrator A asked Maitra if he received his check from Sacred Heart in January
2013. Maitra responded that he thought so. Administrator A explained that Novak
wanted Administrator A to hand out the checks every month. Administrator A told
Maitra that "from now on" Novak wanted Maitra to come to Administrator A's office
and Administrator A would hand Maitra his check. Administrator A told Maitra that
Sacred Heart's monthly check to Maitra was due to be delivered "next Thursday,"
March 7, 2013. Administrator A then asked Maitra "can you bring in more business?"
Maitra responded that he was "trying" to do so, but that one of his patient referral
sources had stopped sending patients to him.

71. During the same conversation with Maitra on February 28, 2013,
Administrator A explained that Novak was aware that Maitra had done a lot of
surgeries at Sacred Heart because Novak "looks at the reports of the surgeries."
Matira, in turn, told Administrator A that he was performing close to ten surgeries a

week at Sacred Heart. Maitra explained that from 10:00 a.m. to 5:00 p.m., he can "easily finish ten cases. That's a lot of cases. That's good for you [Sacred Heart]. That's good for all of us [Sacred Heart and Maitra]." Administrator A asked Maitra "When you first got the check from the hospital, how did that work? Was it based on number of cases?" Maitra responded "I don't know. [Novak] just did it." Notably, Maitra did not tell Administrator A that he received a check from Sacred Heart in exchange for having taught medical students at the hospital. In fact, at no point did Matira discuss the teaching of medical students at Sacred Heart. Instead, Maitra returned to discussing the need for Administrator A to make sure that Sacred Heart transported Maitra's insurance patients to the hospital. Maitra referred to the insurance patients as "good patients" and described that one particular procedure "will pay $15,000 or $16,000." Maitra then asked Administrator A to "take care of" another prospective referral source, so that the source would refer patients to Maitra. Administrator A has told investigating agents that he understood Maitra to suggest that if the source referred patients to Maitra, Maitra would, in turn, refer those patients to Sacred Heart.

72. On March 6, 2013, Administrator A had a consensually recorded meeting in his office with Maitra. During this meeting, Maitra complained that his referrals to Sacred Heart had been dropping because his contact had stopped referring patients to Maitra due to Sacred Heart's alleged failure to provide that individual certain paperwork concerning those patients. Maitra explained that his contact used to send Maitra ten patients a week. Nevertheless, Maitra told Administrator A that he had

33

recently referred "three insurance patients" who were admitted at Sacred Heart, and that he had performed a procedure on one of those patients with an insurance billing value of between $15,000 and $16,000. Maitra explained to Administrator A that he used to make Novak "so much money" performing almost daily penile implant procedures on patients, but that he no longer performed as many of those procedures because Medicare had decreased their Part A and Part B rates of reimbursement for that procedure. Maitra did not comment on whether the patient need for the procedure had somehow changed. Administrator A asked Maitra "who do you use for the professional liability?" Maitra responded, "Ed [Novak]'s company." Administrator A asked "Bentley [Insurance]?" Maitra responded, "Bentley [Insurance], yeah."

73. On or before the morning of March 7, 2013, Administrator A received a Sacred Heart check to provide to Maitra. Administrator A photographed and provided an image of the check to investigating agents. The check, payable to Subir Maitra MD, was dated March 5, 2013, bearing check number 35128, and drawn on Sacred Heart's operating account at First Merit Bank. The check included the signatures of Novak and Payawal.

74. On the morning of March 7, 2013, Administrator A contacted Maitra by telephone to inform him that he had Maitra's monthly check. Administrator A consensually recorded the telephone call. In their brief conversation, Administrator A told Maitra that Administrator A had Maitra's check, and that Novak had instructed Administrator A to hand deliver the check directly to Maitra. Maitra said he would be at Sacred Heart in fifteen minutes to pick up the check.

75.     Within an hour, Administrator A delivered the check to Maitra during a consensually recorded meeting in Administrator A's office. During their conversation, Administrator A handed Maitra the Sacred Heart check, which was then enclosed in an envelope. Maitra asked if Novak was happy. Administrator A responded, "Well, he wants me to hand the check to you. And you know he wants to know the volume you're bringing in, like for the case." Maitra asked if Novak wants more cases. Administrator A responded in the affirmative, saying "more cases." Maitra opened up the envelope containing the check and said "two thousand," apparently referring to the amount of the check. Maitra explained that he brought in "five insurance" cases the week of March 4, 2013, and that he generally brings in three to four insurance cases each month. Administrator A responded that Novak should be happy. Maitra replied, "yeah, he should give me more." Administrator A asked if Maitra was saying that Novak should give Maitra more money. Maitra responded laughingly, "yes." At no time did Maitra discuss the teaching of medical students at Sacred Heart.

76.     Based on records from Sacred Heart's operating accounts at Fifth Third Bank and First Merit Bank, between June 2010 and March 2013, Sacred Heart issued approximately 34 checks totaling approximately $68,000 in Maitra's name. The signatures of Novak and Payawal appear on each check. Based on the foregoing, I believe that Sacred Heart's payments to Maitra were kickbacks in exchange for Maitra's referral of patients to Sacred Heart, including patients insured by Medicare.

### E.    Dr. Venkateswara "V.R." Kuchipudi

77.    According to the Illinois Department of Financial and Professional Regulation's website, V.R. Kuchipudi is a physician who has been licensed to practice medicine in Illinois since 1975.  Cooperating source reporting and Medicare and Medicaid claims data show that Kuchipudi has privileges and treats patients at Sacred Heart.

78.    In September 2007, Kuchipudi executed an application to change his provider enrollment in the Medicare program.  As part of that application, Kuchipudi signed a certification statement in which he attested that he "agree[d] to abide by the Medicare laws, regulations and program instructions that apply to [it]," and that he understood that "that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the [provider's] compliance with all applicable conditions of participation in Medicare."

79.    According to Administrator A, Kuchipudi is one of Sacred Heart's most prolific patient referral sources.  Physician A similarly described Kuchipudi as one of Sacred Heart's primary patient sources during Physician A's tenure at Sacred Heart. Physician A stated that Kuchipudi was known within the hospital as the "king of nursing homes."

80.    According to Administrator A, Sacred Heart has paid and is paying Kuchipudi for Medicare-insured patient referrals in different ways.  First, Sacred

Heart has paid and is paying the salary of Employee A, a physician assistant, and Employee B, a registered nurse, who are effectively employed by Kuchipudi. Although Employees A and B are assigned to work almost exclusively for Kuchipudi, and Kuchipudi therefore obtains the primary benefit of their services, the hospital pays the majority of their salaries. Second, Sacred Heart has also agreed to pay Kuchipudi for patient referrals by agreeing to pay Physician B for treating Kuchipudi's patients at Sacred Heart, despite the fact that Kuchipudi, and not the hospital, has billed patients' insurers for the services Physician B provided to those patients.[16] Administrator A explained that these arrangements benefit Kuchipudi by deferring employee salary costs that he would normally have to pay himself.

81.     In his conversations with Sacred Heart administrators, Kuchipudi has self-identified the importance of his practice to Sacred Heart's vitality. For example, in a consensually recorded February 28, 2012 meeting with Administrator A and Physician A in Sacred Heart's board room, Kuchipudi explained that he wanted Sacred Heart's staff to admit all of his patient referrals, irrespective of the patients' apparent need. In justifying his demands, Kuchipudi explained the fiscal importance to Sacred Heart of admitting his patients: "The hospital has suffered. They need patients." Kuchipudi then stated how he served as a significant source of Sacred Heart's patient population.

---

[16]  According to Administrator A, at Kuchipudi's request and with Novak's express approval, Sacred Heart has recently begun further compensating Kuchipudi by providing him with monthly "gift" cards redeemable at Gibson's Steakhouse in Chicago.

82.     Kuchipudi reminded Administrator A of his importance to the hospital in a consensually recorded meeting on March 7, 2013. At the onset of their discussion, Kuchipudi asked Administrator A: "Do you see my census here? I had seven admissions yesterday," to which Administrator A replied "You had seven admissions?" Kuchipudi stated: "Last night. All night, I guess." When Administrator A then noted that Kuchipudi was a "busy doctor," Kuchipudi chuckled and noted, "seven." Kuchipudi further stated that all seven patients that he had referred "ha[d] problems, real problems." Kuchipudi then stated that he then had approximately seventeen patients residing in the hospital, which, he explained, constituted almost half of Sacred Heart's non-drug stabilization patient census.

83.     Administrator A consensually recorded yet another meeting with Kuchipudi in his office on March 11, 2013. During this meeting, Kuchipudi stated that he had increased his contribution to Sacred Heart's census to twenty active patients. Kuchipudi explained that he was the source for over half of the hospital's total patient population at that time.

### 1.     Employee A

84.     According to Administrator A, Sacred Heart agreed to compensate Kuchipudi for his patient referrals by assigning Employee A to assist Kuchipudi full time in or about December 2010.[17] In particular, Employee A treats Kuchipudi's patients at Sacred Heart and various nursing home facilities located throughout the

---

[17] Administrator A has told investigating agents that the Employee A – Kuchipudi arrangement was established by his predecessor.

Chicago area. Kuchipudi is able to bill patients' insurers for those services.[18]
Nevertheless, Employee A is compensated for the same work by both Sacred Heart and
Kuchipudi. Bank records obtained from Fifth Third Bank, First Merit Bank and JP
Morgan Chase reveal that as of March 2012, Sacred Heart was paying Employee A bi-
weekly payments of $1,968.88, while Kuchipudi was paying Employee A monthly
payments of approximately $1,754.65.[19] Based on these payments, Sacred Heart
appears to pay over 70% of Employee A's salary.

85.     Administrator A explained that the net effect of this payment scheme is
to maintain Employee A's overall compensation, while decreasing the amount of money
that Kuchipudi pays for her services, thereby providing Kuchipudi an indirect benefit.
Administrator A stated that Sacred Heart has established a comparable arrangement
with Kuchipudi and Employee B.

86.     Administrator A explained that when he first learned that Sacred Heart
paid Employee A to work for Kuchipudi as a concealed payment for patient referrals,
he questioned Novak about the relationship. According to Administrator A, Novak

---

[18] A review of Medicare claims data shows that although she is assigned a Medicare
provider number, no claims have been submitted to Medicare for Employee A's services over
the last year. Nevertheless, according to Individual A and others, Empoyee A is treating
Medicare-insured patients. In my training and experience, the lack of Employee A claims data
for the provision of those services suggests that Employee A's patient services are being billed
to Medicare under another provider's Medicare number. Because Employee A is a physician's
assistant, services provided by her would be reimbursed by Medicare at a lower rate than the
same services provided by a physician.

[19] JP Morgan Chase records further reveal that Kuchipudi paid Employee A a bonus
of approximately $5,000 in December 2012. In addition, Kuchipudi has told Administrator A
that he has included Employee A on his company health plan.

39

acknowledged that Sacred Heart could not assign a physician assistant to assist only one doctor because the benefit to the doctor would not be sufficiently concealed. Novak, however, indicated that he wanted to continue to pay Kuchipudi. According to Administrator A, Novak initially suggested finding other ways in which Sacred Heart could compensate Kuchipudi for his patient referrals, including appointing Kuchipudi to a paid directorship or committee chair. Despite this suggestion, according to Administrator A, Sacred Heart has not amended the Kuchipudi – Employee A relationship, and Sacred Heart has continued to pay the majority of Employee A's salary.[20]

87.     On February 26, 2013, Administrator A consensually recorded a conversation with Employee C, a consultant retained by Sacred Heart, who indicated that he was familiar with Employee A's assignment to Kuchipudi. In their conversation, Employee C indicated that he was present when Administrator A's predecessor and Kuchipudi agreed that Sacred Heart would assign Employee A to Kuchipudi. Employee C described the relationship as follows:

> The program was the hospital would hire the P.A.'s for the M.D.'s. We, in turn, provide the benefit for the person and how we're going to benefit for it is [that] I have a group of P.A.'s and N.P.'s that are going to see all of the patients in house. Supported by my E.R. physician. In turn, I'm

---

[20]    According to Administrator A, following an audit by CMS and State of Illinois investigators in March 2013, Novak reiterated the need to make sure that payments made to physicians for patient referrals were sufficiently concealed. In a March 13, 2013 consensually recorded meeting in Novak's office, Novak reminded Administrator A: "Regarding [Employee A], she's got to be seeing other patients, not just Kuchipudi's." Novak reiterated this point in a March 15, 2013 consensually recorded conversation with Administrator A in which Novak instructed Administrator A to "make sure" that both Employees A and B "see" other physicians' patients.

> going to make this group of P.A.'s and N.P.'s available to the physicians
> so that you can refer a patient here. We follow the patient for you. If
> there's any need or problem with your patient, my ER physician will come
> in and direct the care of the patient . . . labs . . . whatever, but you retain
> the patient. You will make money and guarantee that your patient is
> protected, that it's not going to be stole [sic] from you and we make money
> on the Medicare admission.

Employee C further explained that when treating Kuchipudi's patients in nursing

homes, if Employee A observed a patient that needed hospital care, "[the patient] goes

. . . unless it's a 911, exclusively they come here to Sacred Heart. That's the

arrangement." Administrator A has explained that based on this conversation, he

understood that Kuchipudi would benefit from the Employee A assignment by billing

for her services, while Sacred Heart would benefit from the Medicare admissions and

resulting billing it received in return.

      88. On February 27, 2013, Administrator A consensually recorded a meeting

that he had with Employee A regarding the scope of her employment. In that

conversation, Employee A verified that her primary responsibility at Sacred Heart was

serving Kuchipudi's patients. Employee A explained that beginning in or about

December 2010, Administrator A's predecessor told Employee A that she would, on a

going-forward basis, be responsible for assisting Kuchipudi by treating his patients in

the nursing homes in which they resided and in Kuchipudi's clinical office. Employee A

told Administrator A that if there are times at which Kuchipudi does not need her

assistance, she is then available to assist other Sacred Heart physicians. Employee A

acknowledged, however, that she performs the majority of her work for Kuchipudi. She

further told Administrator A that Sacred Heart continues to pay approximately 75%

of her total salary. During that same meeting, Administrator A provided Employee A
with a check reimbursing Employee A for travel expenses that Employee A explained
she incurred traveling to see Kuchipudi's patients.

89.     Administrator A discussed the Employee A arrangement with Kuchipudi
during a consensually recorded February 14, 2013 meeting. In that conversation,
Administrator A asked Kuchipudi about Employee A's value to Kuchipudi's practice.
Kuchipudi stated that Employee A was "a big help." Kuchipudi explained that both the
hospital and he paid Employee A's salary. Kuchipudi noted that he paid a portion of
Employee A's salary because of the risk that "Ed [Novak] will get in trouble."
Administrator A subsequently asked Kuchipudi: "And [Employee A and Employee B]
see your patients? . . . Novak said okay?" Kuchipudi responded, "Yeah. Don't shake
the boat." Kuchipudi then told Administrator A that he wanted Sacred Heart to give
Employee A a raise.

90.     Administrator A and Kuchipudi discussed the Employee A arrangement
again during a consensually recorded March 1, 2013 meeting. In their conversation,
Kuchipudi explained how Employee A was working with him to treat his patients. He
assured Administrator A that Employee A also worked for the hospital. "If other
doctors are asking for help, she can help them," he explained.

91.     Administrator A asked Payawal about the Kuchipudi – Employee A
relationship in a consensually recorded March 21, 2013 telephone call. In their
conversation, Payawal confirmed that Administrator A's predecessor had assigned
Employees A and B to Kuchipudi to entice him to refer patients to Sacred Heart. "I

42

think that was the main reason we created the P.A. [position] – to do the work for the doctor, particularly Kuchipudi. I don't think he would come here if that was not set up for him." Payawal explained that "[Employee A] and another lady [Employee B], I can't recall her name, [they] always worked for Kuchipudi." When Administrator A asked, "[T]hat's why he brings all of his admissions here probably," Payawal answered: "Oh, yea, yea, yea."

### 2. Physician B

92.     According to the Illinois Department of Financial and Professional Regulation's website, Physician B has been licensed to practice medicine in Illinois since 1985. Cooperating source reporting and Medicare and Medicaid claims data show that Physician B has privileges and treats patients at Sacred Heart.

93.     On September 20, 2012, Administrator B consensually recorded a meeting with Administrator A and Physician B at Sacred Heart.[21]  At the onset of their meeting, Administrator A explained to Physician B that the hospital wanted to support its "core physicians." "The whole goal is to support our physicians and see if we can bring in more business to the hospital." Administrator A further explained: "If there are more patients coming in, we can adjust our compensation levels upward." In response, Physician B stated: "you have to give the quota to the doctors and the nurses.  You have to have nurses and doctors you can always rely on."

---

[21] Administrator B recorded this meeting with Administrator A before he was aware of and cooperating in the government's investigation.

Administrators A and B then asked Physician B how they could help him obtain referrals for Sacred Heart from the nursing homes with which he had a relationship.

94.     Later in their meeting, Administrator A asked Physician B how Sacred Heart could compensate Physician B for services that he had previously provided treating Kuchipudi's patients. According to Administrator A, in return for Kuchipudi's patient referrals, Kuchipudi had asked that Sacred Heart pay Physician B for Physician B's treatment of his patients at Sacred Heart. In particular, Administrator A told investigating agents that Kuchipudi requested that Sacred Heart pay Physician B for historically seeing Kuchipudi's Sacred Heart patients on weekends, holidays, and other occasions on which Kuchipudi and Employee A were otherwise unavailable. According to Administrator A, because Physician B's services were performed to benefit Kuchipudi, these are payments that normally would be paid by Kuchipudi. In their September 20, 2012 meeting, Physician B asked Administrator A to "see what you can do with Dr. Kuchipudi." Administrator A then noted his understanding of the problem: "Typically, the arrangement would be he [Kuchipudi] bills out under his corporation; the dollars [for the professional services] are collected; it [the money] should have come over to you, but that's not happening." Physician B, apparently confused, asked Administrator A: "You are trying to tell me to wait for the money from Kuchipudi?" Administrator A then assured Physician B that was not the case. Administrator A told Physician B that he would raise the issue with Novak: "Let me see what I can do. I will speak with Mr. Novak."

44

95.     In subsequent conversations that Administrator A consensually recorded on February 14, 2013 and February 22, 2013, both Kuchipudi and Physician B told Administrator A that Novak and Administrator A's predecessor had agreed to compensate Physician B for treating Kuchipudi's patients in the hospital when Kuchipudi was unavailable.  Administrator A, in turn, assured both Kuchipudi and Physician B that he would present their request to Novak.

96.     Over the last two months, Administrator A consensually recorded a number of conversations with Kuchipudi and Physician B in which Kuchipudi has requested that Sacred Heart pay Physician B $16,000 for the services that Physician B provided to Kuchipudi in 2011. Administrator A, in turn, relayed Kuchipudi's requests to Novak, who agreed to make the requested payment.

97.     In a February 28, 2013 consensually recorded meeting, Administrator A told Novak that Kuchipudi and Physician B were requesting the payment because Physician B "is seeing Kuchipudi's patients on the weekends . . . because [Employee A] was not here." Novak responded: "Oh, I don't mind.  Just pay the guy. Pay the guy." Novak then instructed: "[W]ork it out with him, but make sure it is legal. You can't pay him for doing nothing. You can't pay for just seeing the guy's face. He has to have some hospital work or something." When Administrator A inquired: "How do we do that?" Novak, in turn, responded: "I don't know . . . . What are you paying him for?"  Administrator A again explained that "[Physician B] said he was seeing Kuchipudi's patients on the weekends for the last 2.5 years and he said he put in 'X' amount of hours." Novak instructed Administrator A to "just take care of them."

45

98. Kuchipudi also approached Novak and Administrator A regarding the then-proposed Physician B payment during a March 1, 2013 meeting in Administrator A's office that was consensually recorded. Kuchipudi reiterated once again that the payment he was requesting was to compensate Physician B for seeing Kuchipudi's patients and taking calls regarding their care "on the weekend . . . for the last year and a half or two years." Novak again told Administrator A to make the requested $16,000 payment: "Get it done. Take care of it."

99. As mentioned above, on March 4, 2013, CMS and the State of Illinois began an unannounced survey of Sacred Heart's policies, procedures and medical performance. In the days that followed, Novak expressed various concerns to Administrator A, including that Sacred Heart have the requisite paperwork to make it appear that its relationships with its admitting physicians were proper. In a March 11, 2013 consensually recorded conversation, Novak asked Administrator A whether the hospital had a contract associated with the proposed payments to Physician B. In response, Administrator A explained that the only contract Sacred Heart had with respect to Physician B governed the terms of Physician B's treatment of patients in the hospital's clinics. Novak, in turn, asked Administrator A, "how are we paying him then to see Kuchipudi's patients? What were we doing?" Administrator A explained that he did not know, because the establishment of the arrangement had predated his employment with Sacred Heart. Novak then told Administrator A that they needed a contract that could explain the proposed payment to Physician B. Novak explained that the contract could not reflect that Physician B was being paid to see

46

only Kuchipudi's patients. "[Y]ou can't just pay a doctor [for] seeing someone else's patients. . . ." Novak therefore suggested that they draft a contract that would reflect that Physician B was being paid as a "hospitalist. . . . Yea, something like that, . . . He is on call for physicians on medical staff to see patients. . . . Something like that." Novak then instructed Administrator A to have the hospital's outside counsel draft up a "retroactive" contract that could be used to cover the payments.

100.    Administrator A discussed the Kuchipudi – Physician B relationship with Payawal in a March 21, 2013 consensually recorded telephone call. In that conversation, Payawal confirmed that Kuchipudi, and not Sacred Heart, billed for the physician services provided by Physician B for Kuchipudi's patients, and that accordingly, it was Kuchipudi, and not Sacred Heart, that had benefitted from Physician B's patient coverage.

101.    A review of Medicare claims data shows that form 2011 to the present, Kuchipudi has consistently submitted claims for the weekend treatment of patients at Sacred Heart. According to Administrator A, Kuchipudi has generally not treated patients at the hospital on weekends during this period.

102.    Administrator A also consensually recorded an April 1, 2013 conversation that he had with Payawal concerning the Kuchipudi – Physician B payment. During that conversation, Administrator A asked Payawal whether the payment to Physician B was "really a payment to him to get Kuchipudi's patients?" Payawal, in turn, responded that was what he understood the purpose of the payment to be.

47

103.  As instructed by Novak, Administrator A worked with an attorney retained by Sacred Heart to create a backdated contract to justify the payments to be made to Physician B for seeing Kuchipudi's patients. According to Administrator A, Physician B signed the contract on April 12, 2013.

## VI.  Sacred Heart's Unnecessary Emergency Room Admissions

104.  The government's investigation has also revealed evidence that certain Sacred Heart executives, administrators and physicians are engaged in a scheme to defraud Medicare and Medicaid in violation of Title 18, United States Code, Section 1347 by submitting and/or causing the submission of claims and/or the presentment of hospital cost reimbursement reports seeking payment for emergency care evaluation, testing and observation services that are not medically necessary in that the patients receiving those services are not suffering from any symptoms or conditions that justify provision of emergent care services.

105.  In his interviews with investigating agents, Administrator A acknowledged that the pressure to obtain and retain patients at Sacred Heart created an atmosphere in which the quality of care and appropriate medical analysis have been sacrificed. Administrator A explained that Novak ignored numerous complaints that physicians are admitting patients to Sacred Heart who do not require hospitalization. Administrator A stated that Novak has similarly ignored reports that certain physicians have subjected patients to unnecessary medical testing and procedures in an attempt to justify the patients' admissions and to increase billing.

48