# Exhibit A
## (part 2)

106.    Administrator A and Physician A have told investigating agents that Sacred Heart's executives have established a system to admit nursing home patients to the hospital, irrespective of any medical necessity of those admissions. According to Administrator A and Physician A, Sacred Heart has directed its referring physicians to transfer patients to the hospital by ambulance, utilizing certain companies with which Sacred Heart has "a relationship." Physicians are further instructed to characterize the nursing homes patients sent to Sacred Heart through these ambulance companies as requiring "direct admission." According to Administrator A and Physician A, absent such a designation, ambulance drivers transporting the patients may divert the patients to local hospital emergency rooms and not travel, often great distances, to Sacred Heart. By designating patients as "direct admits," Sacred Heart physicians are able to transfer their patients from the nursing homes to Sacred Heart irrespective of their proximity to the hospital.

107.    Administrator A and Physician A told investigating agents that although physicians' transportation instructions identify patients as direct admits, they are direct admits "on paper only." Physician A explained that, in his experience, nursing home patients are brought to Sacred Heart for emergency room observation and evaluation prior to admission.

108.    Administrator A told investigating agents that Sacred Heart established a "code" for referring physicians to use to transfer patients to the hospital without unwanted diversions. Sacred Heart physicians are directed to draft patient transfer orders directing that their patients be admitted to "Room 200A."

49

109.    Administrator A explained that room 200A is not actually a patient room but is, instead, a room used only for patient overflow. According to Administrator A, all patients who arrive with the instructions to be directly admitted to room 200A are, in fact, processed through the hospital's ER. Administrator A has further admitted that processing patients through the hospital's ER, which is then billed to Medicare as alleged emergency care, is not medically necessary.

110.    On September 12, 2012, Administrator B consensually recorded a pre-arranged meeting at Sacred Heart hospital with Novak, Physician C, and a marketer who worked at one of the nursing homes at which Physician C saw patients.[22] During that meeting, Physician C expressed a concern that if she referred patients to Sacred Heart, those patients would be re-routed to different hospitals on their way to the Sacred Heart. To alleviate her concerns, Novak assured Physician C that Sacred Heart had "an ambulance that we work with that won't divert." Novak further explained the process: "Here's what you do, you tell the ambulance . . . you tell the ambulance, 'direct admission to Sacred Heart Hospital room 200A.' That is the code word to go directly there." To which Administrator B followed up: "Did you hear that doc?" Physician C

---

[22]    As reported by Administrator B and confirmed through a number of consensually recorded telephone and in-person meetings, beginning in the late summer or early fall of 2012 and continuing to the present, Sacred Heart has recruited Physician C in part to establish a patient referral relationship with Sacred Heart hospital.

then questioned "200A?" Novak then repeated himself: "Direct admit to 200A. The ambulance knows not to divert."[23]

111.   On April 24, 2012, Physician A contacted investigating agents concerning a patient, whom Physician A claimed was a resident of a nursing home located in Midlothian, Illinois. According to Physician A, the patient was in the process of being transported by ambulance to Sacred Heart before he was redirected by the driver to a different hospital's ER at which Physician A was working.[24] Physician A described the patient as an elderly "dementia patient." Physician A reported that he had obtained copies of the patient's nursing home "resident transfer form" and "physician's orders," which he subsequently faxed to investigating agents. These documents show that the patient had been ordered by Kuchipudi to Sacred Heart "for evaluation." The resident transfer form further noted that the "resident noted a weakness and tremor [and] also stated she is leaning on the table upon up in [unreadable]." The transfer form read "To Dr. Kuchipudi. Send resident to Sacred Heart hosp for direct admit (RM 200) for eval. Noted." According to Physician A, the forms for the transfer of the patient were

---

[23]   Novak similarly described the process during a February 18, 2013 meeting consensually recorded by Administrator A. In that meeting to recruit a different physician, Novak described Sacred Heart as a hospital with a significant "nursing home practice." "They're coming back and forth. We have a deal with an ambulance company so they won't re-route the patient." Novak told the physician that at the conclusion of their care, Sacred Heart "would send [the patients] right back to your nursing home so you keep the patient."

[24]   According to Physician A, the ambulance driver reported that while in transit, the patient's blood pressure dropped, so the patient was re-directed to the hospital in which Physician A was then working.

indicative of the way in which physicians, and Kuchipudi in particular, had transferred patients from nursing homes to Sacred Heart during his tenure in the hospital's ER.[25]

112.    Physician A explained that, in his experience, Sacred Heart's physicians were expected to facilitate this process by using the hospital's ER to screen paid-for patient referrals for conditions that could be used to justify the patients' admission. Physician A stated that this system further benefitted Sacred Heart because it allowed the hospital to bill for the patients' emergency room evaluation. Physician A told investigating agents that, in his experience, half of the patients presented to Sacred Heart's ER already had a relationship with one of the hospital's attending physicians and that the majority of those patients were admitted to the hospital from the ER.

113.    Administrators A and B told investigating agents that Novak personally approved of the systemically fraudulent manner in which Sacred Heart processes patients through the hospital's ER, irrespective of the patients' need for emergency care, which was confirmed by Novak's statements in a February 18, 2013 physician recruitment meeting that was consensually recorded by Administrator A. In that meeting, Novak referenced Sacred Heart's use of its ER to admit patients. In particular, Novak encouraged the physician he was pitching to show his ability to refer patients to the hospital by sending them to the hospital's ER. "If you send them to the emergency room, they'll take care of, . . . write the orders."    Administrator A has

---

[25] Investigating agents' review of a Google Maps inquiry showed that the nursing home at which the patient had resided was approximately 29.5 miles from Sacred Heart, while the hospital at which Physician A was working was only approximately 5 miles from the nursing home.

explained that he understood this to mean that if the physician sent his patients to the hospital, the ER physicians would facilitate their admission.

114.    Physician A told investigating agents that, in his experience at Sacred Heart, many of the patients sent to the ER in this fashion presented stable and did not require emergent care, let alone further hospitalization.[26] Physician A described the patients sent to Sacred Heart by ambulance as elderly nursing home residents who lived throughout the Chicago area, often at a great distance from Sacred Heart. Physician A stated that many of the Sacred Heart patient referrals processed through the ER were suspect. In particular, Physician A explained that many of Kuchipudi's patient referrals were sent to Sacred Heart's ER diagnosed with only a "mental status change." He further reported that Kuchipudi's elderly patients often arrived late at night. Physician A explained that some of the patients suffered from chronic medical conditions requiring long-term care, but not hospitalization, let alone emergent care.

115.    According to Physician A, certain ER physicians, unable to observe any symptomology requiring hospitalization in these patients, would try and contact Kuchipudi to inquire about his reasons (*i.e.*, diagnoses) for referring the patients to

---

[26]  The Code of Federal Regulations, implementing CMS's Medicare Managed Care Manual, defines an emergency medical condition as "[A] medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that a prudent layperson, with an average knowledge of health and medicine, could reasonably expect the absence of immediate medical attention to result in: Serious jeopardy to the health of the individual or, in the case of a pregnant woman, the health of the woman or her unborn child; Serious impairment to bodily functions; or Serious dysfunction of any bodily organ or part." 42 C.F.R. § 422.113(b)(1)(i)(A)-(C).  The regulations further define "Emergency services" as services "[n]eeded to evaluate or stabilize an emergency medical condition."  42 C.F.R. § 422.113(b)(2)(A)-(B).

Sacred Heart. Kuchipudi, however, would not answer his phone after hours, leaving the treating ER physician no option but to discharge the patient, observe and test the patient, or unnecessarily admit the patient to Sacred Heart.[27]  Physician A explained that if an ER Physician did not admit his referrals, Kuchipudi became incensed.[28]

116.    On February 28, 2012, Physician A consensually recorded a pre-arranged meeting with Administrator A and Kuchipudi concerning the manner in which Kuchipudi's patients were being processed through Sacred Heart's ER. Before Kuchipudi arrived, Administrator A explained to Physician A that Kuchipudi wanted to talk about how his patients were to be admitted at the hospital. Administrator A explained the purpose of the meeting as follows:

> He's [Kuchipudi] gonna want to tell you that your doctors in the ER accept his patients. They should be doing history and physicals on the patients, even if they feel the patients should not be admitted. They should be putting them into observation. Within 24 hours, he can come in to assess the patient and admit the patient. See, he's sending the patients in, with the thought that they need to be admitted. We have a couple of our doctors that are . . . reviewing the patients . . . they're not communicating to Dr. Kuchipudi to find out why the patient is coming in . . . maybe, sometimes it's not written. And, they're saying: discharge the patient back to the nursing home. . . . So, I think he wants to talk a little bit about that. Maybe about, frustrated with the experience. And, then

---

[27]    According to Physician A, Sacred Heart's management actually instituted a policy precluding ER physicians from contacting Kuchipudi after hours (when he directed patients to the hospital's ER) so as not to disturb him.

[28]    Physician A explained that while he was employed at Sacred Heart, he received complaints from other physicians who worked in the ER who believed that Kuchipudi was referring patients to the hospital without medical justification for their hospitalization.

after we have this meeting we can tell the rest of the staff that this is the way we need to move forward as a group.[29]

117.    Kuchipudi arrived and stated that his patients needed to be "direct admissions" to the hospital. He explained that "[w]hen we tell them to admit a patient . . . , they have to be seen for sure." Kuchipudi noted that his patients' ambulances were bypassing "so many hospitals" in order to come to Sacred Heart.

118.    Kuchipudi further instructed that he thought that a "complete evaluation" should be performed on the patient referrals he sent to Sacred Heart's ER. Physician A stated that one of the problems was that Kuchipudi's patients arrived without detailed medical histories and recorded evaluations to provide guidance to the hospital's ER physicians. Kuchipudi, in turn, explained that his patients should just be thoroughly evaluated. He listed some of the tests that could be performed on his patients as part of that evaluation: urine cultures, blood cultures, EKGs (electrocardiograms), chest x-rays, and CVC (central venus line) or CMP (comprehensive metabolic panel) blood tests.

119.    Administrator A confirmed that Sacred Heart's use of its ER for patient evaluation and admission as outlined in the February 28, 2012 meeting with Physician A has continued to the present. In particular, physicians are expected to evaluate and admit Kuchipudi patient referrals that are presented to the ER.

---

[29]    Administrator A has since told investigation agents that, at the time of this February 28, 2012 meeting, he understood that certain physicians in the ER did not believe that Kuchipudi's patient referrals warranted hospital admission, but that it was the policy of the hospital to admit Kuchipudi's patient referrals because Novak wanted the hospital to receive the revenue that would be obtained by admitting those patients.

120.    Medicare claims data obtained from Cahaba Safeguard Administrators, LLC,[30] show that from about January 2009 to about February 2013, Medicare paid Sacred Heart at least approximately $18,503,578 in reimbursements for approximately 1,864 Part A claims for patients who received emergency room and observation services, and then were admitted for in-patient services at the hospital.    For approximately 335 of those claims, Kuchipudi was listed as the attending physician, comprising at least approximately $3,505,599 (about 19%) of these "direct admits" via the hospital's emergency room.

## VII.    Medically Unnecessary Patient Intubations and Tracheotomies

121.    The government's investigation has also revealed evidence that certain Sacred Heart executives, administrators and physicians are engaged in an additional scheme to defraud Medicare and Medicaid in violation of Title 18, United States Code, Section 1347 by submitting and/or causing the submission of claims and/or the presentment of hospital cost reimbursement reports seeking payment for the sedation,

-----

[30]    HHS and CMS have awarded contracts to third-party vendors to collect and maintain Medicare claims and payment data as part of the federal government's Medicare Program integrity efforts.  In Illinois, Medicare Part A and Part B claims and payment data are maintained by Cahaba Safeguard Administrators, LLC.

intubation and subsequent performance of tracheotomy procedures on patients absent the medical necessity to perform these medical procedures on the subject patients.[31]

122.   According to Illinois Department of Financial and Professional Regulation records, Physician D is a physician licensed in the state of Illinois.  According to Administrator A, Physician D is a pulmonologist under contract at Sacred Heart as an "Intensivist," providing medical services to respiratory patients admitted to the hospital. Physician D also serves as the chair of the Critical Care Committee of the hospital's medical staff.  Administrator A has told investigating agents that Sacred Heart pays Physician D on an hourly basis for his services, and that Physician D bills Medicare and Medicaid for his Part B services, while the hospital bills those insurers for the associated Part A services it provides.

123.   In interviews with investigating agents, Administrator A stated that members of the Sacred Heart nursing staff, including the ICU clinical case manager and the hospital's director of nursing, have raised concerns that Physician D performs a high number of unnecessary intubations, and purposefully and unnecessarily

---

[31] According to the webpage for Medline Plus, which is a service of the U.S. National Library of Medicine and National Institutes of Health, a tracheal intubation is a procedure in which a tube is placed into the windpipe (*i.e.*, the trachea) through the patient's mouth or nose often to facilitate ventilation of the lungs, including mechanical ventilation, and to prevent asphyxiation or airway obstruction.  Due to the associated discomfort of the procedure, anesthetics are often prescribed for the patients.  *See* www.nlm.nih.gov/medlineplus/ency. According to the Mayo Clinic's website, a tracheotomy is a surgical procedure in which a hole, referred to as a tracheostomy, is created through the front of a patient's neck and into their windpipe in order to allow the patient to breathe through the newly created air passage. Tracheotomies may be performed on patients whose breathing is somehow obstructed or who suffer from medical conditions that require the use of a breathing machine (*i.e.*, a ventilator) for an extended period of time, usually more than one or two weeks.    *See* www.mayoclinic.com/health/tracheostomy.

prolongs them by directing the heavy sedation of his patients. While a patient is under such sedation, she is unable to breath without the assistance of a ventilator, and is likely to fail diagnostic breathing tests administered to determine whether the patient can breathe on her own. According to individuals with whom Administrator A has consulted, these unnecessary, prolonged intubations have caused complications that have resulted in tracheotomies being performed on patients by Sacred Heart surgeons that may not have been necessary.

124.    Administrator A advised that during a lunch with Novak and Payawal in December 2012, Novak and Payawal explained that tracheotomy cases provide substantial insurance reimbursement income for the hospital. On March 1, 2013, during a meeting in Administrator A's office that Administrator A consensually recorded, Novak stated that tracheotomies are Sacred Heart's "biggest money maker" and that the hospital can make "$160,000 for a tracheotomy if the patient stays 27 days." On March 7, 2013, during a meeting at Sacred Heart that Administrator A consensually recorded, the ICU case manager told Administrator A that she often must "stretch" the length of hospital stay for a tracheotomy patient to 28 days to maximize Medicare reimbursements "to make Novak happy."

125.    In interviews with investigating agents, Administrator A has identified Employee C as an employee of a healthcare management consulting company, which, according to its website, provides "consultative services" for numerous nursing homes in the Chicago area, and who has been employed to provide alleged supervisory services to Sacred Heart. According to Administrator A, and as confirmed in multiple

conversations consensually recorded by Administrator A, Employee C works at one of the nursing home facilities at which Kuchipudi sees patients. According to Administrator A, Employee C works with Kuchipudi and the nursing homes to facilitate the admission of respiratory patients to Sacred Heart. The hospital, in turn, pays the healthcare management consulting company for whom Employee C works a monthly $7,000 payment.

126.    According to Administrator A, the hospital's consulting contract with the healthcare management consulting company pursuant to which Employee C allegedly supervises Sacred Heart's respiratory therapists, is designed to conceal the hospital's payments for respiratory patient referrals. In interviews with investigating agents, Administrator A stated that he has recommended to Novak on several occasions that Sacred Heart terminate the $84,000 contract because it is excessive and a waste of money, as Employee C is only present in the hospital a few hours per week and, according to Administrator A, Employee C does not seem to perform much if any actual work supervising therapists. Nevertheless, according to Administrator A, Novak has consistently refused to terminate the contract. According to Administrator A, Novak previously advised that "there's more to it than just the contract," and that the relationship is a source of nursing home patient referrals for the hospital.

127.    On February 22, 2013, Administrator A placed a consensually recorded call to Employee C to discuss issues related to the intubation and subsequent tracheotomies performed on respiratory patients at Sacred Heart. In response to Administrator A's inquiry, Employee C asked Administrator A if they were having a

"confidential, off-the-record conversation." Employee C indicated that in answering Administrator A's inquiries, he was "putting [his] life in [Administrator A's] hands." Employee C then explained that, generally, an intubated patient's sedation must be reduced and the process of weaning the patient from the ventilator must start within 72 hours of intubation. The sedation is reduced so that the patient "starts waking up" and may try to breathe without the ventilator. If a patient can breathe on his own without the ventilator, the breathing tube may be removed, and a tracheotomy is avoided. Employee C explained, however, that he and his staff recognize that Physician D over-sedates the intubated patients so that they are not able to breathe on their own. After the over-sedated patient fails three breathing tests, the patient is deemed ventilator-dependent, and a tracheotomy is ordered for the patient. Employee C stated that one Sacred Heart physician with whom Employee C had spoken noticed that Sacred Heart performs more tracheotomies than other, busier hospitals in Chicago that the physician visits.

128. In the same recorded conversation, Employee C stated that Novak monitors the number of intubated patients at Sacred Heart and frequently asks Employee C how many potential tracheotomies are in the hospital at any given time. Employee C also explained that Physician D intentionally extends tracheotomy patients' stay in the hospital, thereby earning more money in insurance reimbursements for the hospital. Employee C further explained that Physician D also makes more money on these patients, because Physician D may bill $160 for each visit in the hospital, as opposed to billing only $32 for visiting a ventilator patient in a

nursing home. After the 27-day stay at Sacred Heart, Physician D transfers the patients to a long-term intensive care facility, where Physician D can continue to bill $160 per visit for up to 35 more days. After residing at the extended-care facility for the 35-day limit paid by Medicare, the patient returns to the nursing home from where they came and where Physician D continues to see the patient. Employee C stated that following these patients as they move from facility to facility, and billing for professional services, is "the name of the game" for Physician D.

129. On February 20, 2013, during a meeting at Sacred Heart that Administrator A consensually recorded, the hospital's director of nursing and ICU case manager raised similar concerns. The ICU case manager explained that Physician D unnecessarily intubates some elderly and disabled patients and places them on a ventilator, rather than managing their simple respiratory difficulties with less intrusive therapy. The case manager further explained that Physician D intentionally orders the administration of a high level of sedation so that the patient will be unable to breathe on his or her own, and will fail multiple breathing tests. The director of nursing noted that the patients remain intubated for long periods of time, often 7 to 10 days or more, after which time the patients' tracheas have become damaged and a tracheotomy is ordered, usually to be performed by Physician E, a Sacred Heart surgeon. The case manager explained that if the patient survives the tracheotomy, the patient is transferred from Sacred Heart to a long-term intensive care facility, where

61

Physician D continues to follow the patient before the patient is transferred back to the nursing home.[32]

130.    In a telephone call that Administrator A recorded on February 28, 2013, the director of nursing advised Administrator A that Physician D had intubated Individual A, a patient of Kuchipudi's, eight days earlier and had kept Individual A under heavy sedation since that time. The director of nursing noted that Individual A was scheduled for a tracheotomy by Physician E the next day, March 1.

131.    At the direction of law enforcement, on February 28, 2013, Administrator A consensually recorded a phone call with Physician F, the chairperson of the Performance Improvement and Utilization Review Committee,[33] in which Administrator A instructed Physician F to scrutinize Individual A's case and determine whether the scheduled tracheotomy was medically necessary. Administrator A asked Physician F to have the hospital's President of its Medical Staff, Physician G, do the same.

---

[32] On March 6, 2013, during a meeting in Administrator A's office that Administrator A consensually recorded, the ICU case manager told Administrator A that around Christmas 2012, a representative from the long-term care facility called the case manager every day asking if she had any patients to send for long-term care. The case manager further stated that during a short period of time that month, Physician D intubated seven patients and told the long-term care facility representative that he would be sending them all to his facility. In a consensually recorded phone call on February 28, 2013, the director of nursing told Administrator A that he previously worked at a level-one trauma center with 440 beds and 60 ICU beds, where one tracheotomy per month "was a lot" and "nothing like [the] December [2012]" experience at Sacred Heart.

[33] According to Administrator A, the Performance Improvement and Utilization Review Committee is purportedly responsible for overseeing staff resources in the medical treatment of patients and determining whether patients are hospitalized for the appropriate length of stay, among other things.

132.    The next day, March 1, 2013, Administrator A consensually recorded a call with Physician D during which Physician D told Administrator A that he had recently discussed Individual A's case with Kuchipudi, and that they decided to postpone the tracheotomy. Physician D offered: "we have enough mortality and death after procedures, we want to make sure the patient is stable before we put a trache on the patient." Physician D explained that Physician D had not ordered the tracheotomy and that Physician E "wrote his own consult," placing Individual A on the surgery schedule without consulting Physician D or Kuchipudi.

133.    Later that same day, Administrator A consensually recorded a meeting in Administrator A's office with Novak and the director of nursing. Administrator A asked Novak what was happening with Individual A's tracheotomy case. Novak responded: "I don't know, we'll find out." The director of nursing stated: "For today it's on hold. It's not happening," to which Novak responded: "It might. We'll see." Later in the conversation, Administrator A asked Novak if he was upset about the cancellation of the tracheotomy, and Novak replied: "Tell me about it! Tell me about it!" Novak said Physician D stopped the tracheotomy but Physician D was talking to Kuchipudi about it: "You know, you have one guy say no and one guy say yes . . . Kuchipudi better make the call."

134.    According to Administrator A, Individual A was subsequently successfully weaned from the ventilator and did not receive a tracheotomy. He was discharged from the hospital shortly thereafter. In a consensually recorded phone call on March 5, 2013, Physician E told Administrator A that Physician E had reviewed the x-rays for

Individual A and that Physician D was "correct," a tracheotomy was not needed for Individual A.

135.    Based on a review of Medicare claims data for the period February 2010 to January 2013, the mortality rate for Medicare patients who received tracheotomies from Physician E at Sacred Heart far exceeded the mortality rate for patients who received tracheotomies within Illinois. Of the 4,254 Medicare patients who underwent tracheotomies performed by other surgeons, 240 died within 14 days of the surgery, resulting in a mortality rate of approximately 5.64%. For the 28 Medicare patients upon whom Physician E performed tracheotomies at Sacred Heart, five died within 14 days of the surgery, resulting in a mortality rate of approximately 17.85%.

136.    According to Administrator A, Sacred Heart physicians recognize problems with the hospital's intubations and tracheotomy protocols, but blame the patients' medical histories for the negative results experienced by the patients. For example, on March 5, 2013, Administrator A consensually recorded a phone call during which Physician E stated the mortality rate in Sacred Heart's ICU is higher than at other hospitals because the patients come with "multiple co-morbidities." Also on March 5, 2013, in Administrator A's office, Administrator A consensually recorded a conversation with Physician D, Physician F, and the head of the hospital's Surgery Committee, Physician H, during which Physician F recognized there was room for improvement on the hospital's tracheotomies, but explained, "things are not as bad as they are being made out to be" and "we have a lot of sick patients." Physician D had

a different take, noting that Individual A was "mentally retarded" and stating that Physician E is taking advantage of the "low-intelligence population in the area."

137. On March 4, 2013, investigators from CMS and the State of Illinois arrived at Sacred Heart Hospital to conduct an investigation of the hospital's intubations and tracheotomies, and quality assurance and performance improvement protocols, among other issues. According to Administrator A, the investigators interviewed Employee C, Physician D, the ICU case manager and the ICU nurse manager, among many others as part of their inquiry.

138. On March 5, 2013, in Administrator A's office, Administrator A consensually recorded a conversation with Employee C, during which Employee C admitted he did not tell the investigators what he previously had told Administrator A about Physician D over-sedating the intubated patients. Employee C said that his prior conversation with Administrator A was a "private, confidential conversation, off the record." Employee C stated that he had no personal knowledge of Physician D's intubations and that he has only heard "hearsay" of the patient and procedure mismanagement. Employee C explained that if he had been honest with the investigators, it could get him into "a world of trouble." Administrator A and Employee C spoke again on March 6, 2013, in Administrator A's office. Administrator A once again consensually recorded their conversation. During that meeting, Employee C further explained why he had withheld information from the surveyors: an investigation of Sacred Heart intubations and tracheotomies could "mess up my license."

139.   On March 6, 2013, Administrator A consensually audio recorded a conversation that he had within Sacred Heart involving Physician D, the director of nursing, the ICU nurse manager, and the director of the medical staff.   In the conversation, Physician D acknowledged that Sacred Heart had lacked policies for various aspects of intubations and tracheotomies, and that he had given some practice guidelines and procedures obtained from other hospitals to the surveyors in response to their request for Sacred Heart's policies.[34]   Later that day, Administrator A consensually audio and video recorded a meeting in his office with the ICU nurse manager, who told Administrator A that she had never seen the policies and guidelines that Physician D had provided to the investigators.

140.   In that same conversation, the ICU nurse manager told Administrator A that she had reviewed approximately eight tracheotomy patient files in connection with the CMS investigation, and summarized the files for Administrator A.  The nurse manager said Physician D was the pulmonologist for all the patients, and Physician D performed the tracheotomy on all but one.  The nurse manager said there was no documentation in the patient files explaining the decision to intubate the patients, and there was no documentation explaining any efforts to wean the patients from the ventilators.  The nurse manager said that in two files, Physician D had written "plan to trache" without first documenting any efforts to wean the patient from the

---

[34]   During this conversation, Physician D stated that he did not share with the investigators that Individual A had been scheduled for a tracheotomy a few days earlier. Physician D described Individual A as "a little retarded" and said the patient had been returned to a nursing facility.

ventilator. The nurse manager said that none of the patient files contained an order from Physician D for a tracheotomy. With respect to the tracheotomy that had been scheduled for Individual A on March 1, 2013, the nurse manager stated that one of the ICU nurses had advised her that Physician D had previously directed the nurse to "snow the patient," meaning that Individual A should be heavily sedated to the point where the nurse could only see the whites of Individual A's eyes, thereby precluding the patient from being weaned from the ventilator.

141. On March 7, 2013, Administrator A consensually recorded a conversation that he had with Novak, the director of nursing, and a respiratory therapist in Administrator A's office. In that meeting, Administrator A told Novak about the nurse manager's summary of the patient charts he had received, and the fact that each chart lacked a written order for the tracheotomy. Novak replied "you can do a verbal order," and asked if this had only happened once. Administrator A replied that a lack of documentation was found in every chart the nurse manager reviewed, to which Novak replied: "Fuck." Later in the same conversation, Novak told Administrator A and the

67

others present that there has to be documentation for the tracheotomies in the charts because "they're not all emergencies."[35]

142.    On April 8, 2013, Administrator A consensually recorded a meeting with Physician D in Administrator A's office.  According to Administrator A, during the meeting, Physician D advised Administrator A that Novak had asked Physician D to provide two more tracheotomy cases for the hospital soon, before the CMS surveyors might return to the hospital.  Physician D stated that this was not the first time Novak had asked Physician D to provide tracheotomy cases.  Physician D stated that in the last monthly Medical Executive Committee meeting, Novak openly asked for another potential tracheotomy case, but now was asking for two.    Physician D told Administrator A that he was amazed by Novak's openly stated requests.  Physician D told Administrator A that asking physicians for potential tracheotomy surgeries in front of everyone at the Medical Executive Committee was the type of thing that could get the hospital into trouble.

---

[35] On March 27, 2013, Administrator A consensually recorded a conversation within Sacred Heart with the ICU case manager, in which the case manager told Administrator A that Kuchipudi had recently re-admitted Individual A to the hospital. The case manager stated that Individual A had a wound on his thigh, which was likely a bed sore from Individual A's prolonged intubation stay at the hospital the previous month. Rather than perform a simple debridement of the wound, Physician E had performed a more complicated (and expensive) "flap" surgery on Individual A.   In addition, Kuchipudi ordered a cholecystectomy to remove Individual A's gall bladder, which was also performed by Physician E. According to the case manager, Physician F thought the cholecystectomy was not medically necessary, but Kuchipudi and Physician E overruled her.

## VIII.  Proceeds Derived From False Claims and Kickbacks Subject to Seizure

143.   HHS and CMS outsource Medicare provider enrollment and claims processing and payment services to certain approved contractors. In Illinois, Medicare Part A claims processing is administered by National Government Services, Inc. Medicare Part B claims processing is administered by Wisconsin Physician Services.

144.   To obtain reimbursement for the provision of Medicare Part A services (*e.g.*, in-patient hospital care) and Medicare Part B services (*e.g.*, physician services), hospitals and physicians generally have to be pre-approved as Medicare providers. Hospitals and physicians obtain the requisite approval to become Medicare providers by submitting an application to Medicare in which they attest that they will abide by rules, regulations and statutes governing the program's administration, including the prohibition against paying or receiving kickbacks for healthcare service referrals.

145.   A provider accepted as an enrollee in the Medicare program is issued a provider number.  Medicare-approved suppliers are able to submit bills, known as claims, for payment to Medicare for the cost of services provided to beneficiaries. Medicare requires that claims for these reimbursements contain: the beneficiary's name and identification number; the name and unique provider identification number of the doctor who or institution that provided the service; the service that was provided; the location the service was rendered and the date of service; the charge for the service; and, in those instances in which the service is provided in a hospital, the referring physician. Approved Medicare providers are able to submit Medicare claims on paper, or, if they have entered into an electronic data interchange agreement, electronically.

Medicare providers can also choose to be paid for their claims electronically through what is referred to as an electronic funds transfer, or EFT.

146. To bill the Medicaid program for covered services, a provider, such as a hospital or physician, must first obtain a provider number with Illinois Department of Healthcare and Family Services.[36] Once accepted into the Medicaid program, the provider may submit bills (also called claims) to the department either in hard copy or electronically. The claims are adjudicated at the Illinois Department of Healthcare and Family Services, and payment vouchers are created. These vouchers are then sent to the Illinois Comptroller's Office, and checks, called warrants, are written and sent to the provider. If the provider has requested direct deposit, the Illinois Comptroller's Officer electronically deposits the payments directly into the provider's account.

A.     Sacred Heart

147. According to CMS, and as evidenced by bank records obtained by investigating agents, Sacred Heart receives regular Medicare and Medicaid reimbursement payments through electronic fund transfers. According to CMS and bank records obtained from First Merit Bank, beginning or about June 13, 2012,

---

[36] Obtaining a provider number involves submitting a completed application signed by the individual provider, or, in the case of a company, by a corporate officer. In addition, the individual provider or corporate officer (or other authorized person acting on behalf of the corporate entity) must sign an agreement of participation, also called a provider agreement, which states that the "[p]rovider agrees, on a continuing basis, to comply with Federal standards in Title XIX and XXI of the Social Security Act and with all other applicable Federal and State laws and regulations," and that the "[p]rovider agrees to be fully liable for the truth, accuracy and completeness of all claims submitted . . . to the Department for payment. Provider acknowledges that it understands the laws and handbook provisions regarding services and certifies that the services will be provided in compliance with such laws and handbook provisions is a condition of payment for all claims submitted."

Sacred Heart began receiving Medicare and Medicaid reimbursement payments through EFT deposits to an account, held in the name of West Side Community Hospital, Inc., also known as Sacred Heart Hospital, Operating Account, bearing account number XXXXXX1762 maintained at First Merit Bank.[37]

148.    Records obtained from Cahaba show that from on or about June 13, 2012, to on or about February 22, 2013, Sacred Heart was paid an aggregate total of approximately $1,143,406 for Medicare Part A claims for services provided to patients referred to the hospital by Kuchipudi. First Merit Bank records reflect that Sacred Heart received electronic funds transfers of Medicare payments to account number XXXXXX1762 during that period.

149.    According to records obtained from state of Illinois's Department of Healthcare and Family Services, from on or about June 13, 2012, to on or about March 1, 2013, Sacred Heart was paid an aggregate total of approximately $86,334 for services provided to patients insured by Medicaid who referred to the hospital by Kuchipudi. First Merit Bank records reflect that Sacred Heart received electronic funds transfers of Medicaid payments to account number XXXXXX1762 during that period.

150.    Based on the foregoing, I believe that there is probable cause to seize for forfeiture $1,229,740 maintained in First Merit Bank account number XXXXXX1762.

---

[37]    Records obtained from First Merit Bank show that Sacred Heart, through its executives, opened the First Merit Bank account on or about May 18, 2012. Statements from the operating account show that Sacred Heart began receiving EFT payments from Medicare and Medicaid no later than June 13, 2012, and June 15, 2012, respectively.

### B.    Kuchipudi

151.    According to Medicare provider enrollment and EFT agreements obtained from WPS and JP Morgan Chase bank records obtained by investigating agents, Kuchipudi receives EFT claim reimbursements into an account held in a JP Morgan Chase account, bearing account number XXXXX0917, in the name of V.R. Kuchipudi M.D. S.C, doing business as  Brookpark Medical Center.

152.    Records obtained from Cahaba show that from on or about May 1, 2012, to on or about February 22, 2013, Kuchipudi was paid an aggregate total of approximately $101,123.95 for Medicare Part B claims for physician services provided to patients treated at Sacred Heart.  Records obtained from JP Morgan Chase show that Kuchipudi received payments from Medicare into the bearing account number XXXXX0917 during this period.

153.    Based on the foregoing, I believe that there is probable cause to seize for forfeiture  $101,123.95  maintained  in  JP  Morgan  Chase  account  number XXXXXX0917.

### IX.    Other Corporate Entities Tied to Sacred Heart

154.    Public source records and cooperating source information reveal that, in addition to Sacred Heart, Novak has a direct or indirect ownership interest in a number of related entities, including: Superior Home Health, LLC, a home healthcare services company; the Golden L.I.G.H.T. clinics, which are family practice / internal medicine clinics run as unincorporated divisions of Sacred Heart; the Chen Medical Center, LLC, another family practice / internal medicine clinic; the Garfield Kidney

Center, LLC, an out-patient dialysis center; and the Bentley Insurance Group, a medical malpractice insurance company. In addition, Novak owns and/or operates a number of real estate and corporate management/holding companies to include: West Side Management Corporation; BMG Management, LLC; Bentley Management Group, LLC; and Park Place, LLC. Finally, prior to June 2012, Novak operated the Chicago R.E.A.C.H. Foundation, an allegedly non-profit senior-citizen program financed by the state of Illinois.[38]

155. In a series of consensually recorded conversations over the last two months, Payawal has explained to Administrator A various ways in which revenue generated from Sacred Heart is transferred to and among Novak's other corporate interests. As discussed above, a substantial portion of Sacred Heart's revenue comes in the form of reimbursements from Medicare and Medicaid. Payawal has indicated that he and Employee D, the hospital's controller, are responsible for managing Novak's corporate and personal finances.[39] Payawal has further explained that in these roles, he and Employee D have transferred funds generated by Sacred Heart to support Novak's other business interests and have consolidated funds generated by Sacred Heart with those other businesses.

---

[38] Novak closed R.E.A.C.H, in June 2012 when the organization lost its state funding.

[39] In particular, Payawal told Administrator A in a March 14, 2013 recorded conversation that he (Payawal) handles "the hospital side" and Employee D "handles the subsidiaries."

156.    On February 28, 2013, Administrator A and Payawal had a consensually recorded conversation in which Payawal advised Administrator A of the extent and use of Sacred Heart profits.  According to Payawal, Sacred Heart is projected to earn approximately $8 million this year.  Payawal explained that this projected profit estimate did not account for a $2 to $3 million "cushion."  In subsequent consensually recorded conversations on March 7, 2013, and March 14, 2013, Payawal further explained that the "cushion" is money Sacred Heart has deposited into a cash collateral account to support financial covenants guaranteeing a $5 million line of credit obtained by Bentley Management Group.

157.    During the February 28, 2013 conversation, Payawal told Administrator A that he set up a number of businesses for Novak after coming to Sacred Heart, including West Side Management, Chicago R.E.A.C.H., Garfield Kidney Center, Superior Home Health, and Chen Medical Center.  Payawal claimed that the only business that was not profitable was Chen Medical Center.  To emphasize that point, Payawal stated that Chicago R.E.A.C.H. presently had a balance of $11 million despite being closed due to lack of funding.

158.    During their February 28, 2013 conversation, Payawal explained that Novak withdraws funds from his various businesses through alleged "mortgages" that those entities pay to other Novak interests for unrestricted property that Novak owns.  For example, in a February 14, 2013 consensually recorded meeting with Administrator A, Payawal explained that Superior Home Health paid off the mortgage for the building in which it operates, but still pays rent to Park Place.  In a

74

consensually recorded conversation that Administrator A had with Employee D on February 22, 2013, Employee D explained that Park Place is owned by West Side Management. In another consensually recorded conversation with Payawal that same day, Payawal explained that Garfield Kidney Center had also repaid the mortgage for the building in which it operates, but that the company has continued to pay rent to West Side Management. Payawal described these rental payments as a tool to funnel revenues from Novak's health care businesses back to West Side Management.

159.    On March 14, 2013, Payawal and Administrator A had a consensually recorded telephone call. During the conversation, Payawal explained, "all the income" for Sacred Heart "goes to West Side Management Corp., so we . . . . pay taxes through West Side Management Corp." According to Payawal, after taxes are paid, Novak draws income from West Side Management. Payawal further explained that the building in which Sacred Heart is located is owned by "West Side Building Partnership." According to Payawal, Sacred Heart pays this entity $50,000 a month in rent.

160.    During their March 14, 2013 conversation, Payawal told Administrator A that Sacred Heart actually consists of "six or seven corporations," including Chen Medical Clinic, Superior Home Health, West Side Management, Garfield Kidney

Center, and Bentley.[40] Payawal further explained that "Bentley" consists of "three or four corporations" itself, including Bentley Management Group.[41]

## X.   Documents and Records Maintained at Sacred Heart

### A.   The Hospital Facility

161.   According to Administrator A, Novak maintains an office in the executive suite located in the southeast corner of the first floor of the hospital. Novak's office occupies the northeast corner of the executive suite, and has a window facing North Sawyer Avenue. Novak has a computer in his office that he uses to review electronic documents and to receive and send emails to Administrator A, Payawal, and other Sacred Heart employees.

162.   According to Administrator A, Novak and Payawal share an administrative assistant who occupies the office directly south of Novak's office in the executive suite in the southeast corner of the first floor of the hospital. According to Administrator A, copies of physicians' contracts, rental agreements, correspondence, and other documents related to the hospital's doctors and business are kept in file cabinets in the administrative assistant's office.

---

[40]   According to records from the Illinois Secretary of State, Novak serves as the registered agent for Chen Medical Clinic, Superior Home Health, and West Side Management. Those same records identify the "principal office" of Superior Home Health, Garfield Kidney Center, and West Side Management to be the address of Sacred Heart, 3240 W. Franklin, Chicago, IL. Records from the Illinois Secretary of State further show that West Side Management is the registered agent for Garfield Kidney Center.

[41]  According to records from the Illinois Secretary of State, Bentley Management Group was incorporated on May 16, 2008 and maintains its principal office at 3240 W. Franklin.

163. According to Administrator A, the medical staff director, Employee E, occupies the office west of Novak's assistant's office in the executive suite of the hospital. Records maintained in this office include: administrative files for the hospital's physicians, including licensing, credentialing, and malpractice insurance information; minutes for meetings of the hospital's board and committees, including the medical executive committee; audio recordings of said meetings; and files related to the hospital's quality assurance & performance improvement program.

164. According to Administrator A, Sacred Heart employees track daily patient admissions in log books maintained with other records in the reception area across the lobby to the west of the executive suite on the south side of the first floor of the hospital. These admissions logs track patient admissions to the hospital by date, time, patient identifying information, transportation provider, admitting physician and diagnosis, among other information.

165. According to Administrator A, Sacred Heart employees also input this information related to patient admissions into an electronic health record system called CPSI, which is accessible via employees' assigned computers throughout the hospital and the annex over the hospital's computer network. According to Administrator A, CPSI also stores the hospital's financial and accounting data that Payawal utilizes to generate various financial reports, as well as the hospital's policies and procedures for medical treatment of patients, among other things.

166. According to Administrator A, the hospital's computer network servers, which house the CPSI program and related data, the hospital's email server, and other

77

centrally stored digital information, reside in the information technology office, which is located to the west of the reception area (referenced above) on the south side of the first floor of the hospital. According to Administrator A, the hospital's employees utilize Microsoft Outlook to send and receive email from their assigned computers.

167.     According to Administrator A, Administrator A maintains an office on the southeast corner of the third floor of the hospital. In this office, Administrator A maintains binders and files of documents, including copies of Physician Dontracts, hospital financial statements, and correspondence with Novak and other hospital employees. Administrator A uses a computer in his office to send and receive email, to generate spreadsheets, to create reports tracking patient admissions and referrals by physician, as well as the hospital's budget, income, and expenses. Administrator A maintains these electronic files on the hard drive of his computer.

168.     According to Administrator B, the hospital's  Golden L.I.G.H.T. clinic occupies roughly the northwest quadrant of the first floor of the hospital. Administrator B occupies an office to the south of the waiting area located in the middle of the clinic space. Staff members who assist Administrator B, work at workstations and computers located in the area outside Administrator B's office, south of the waiting area.   According to Administrator B, these employees assist Administrator B in tracking patient referrals to and from the clinics and the hospital by physician and marketer, summarizing monthly, weekly, and daily reporting information in electronic reports prepared on their computers. Hard copies of these reports and summaries are maintained in binders and folders on shelves in

Administrator B's office. Administrator B and the staff members circulate the electronic reports to Novak, Administrator A, and others via email.

169. According to Administrator A, records related to the Golden L.I.G.H.T. business, including patient medical records and transportation records, are stored in a file room located behind the waiting area to the west.

170. According to Administrator A, medical records for the hospital's patients are stored in a large "central supply" area occupying most of the east side of the Golden L.I.G.H.T. clinic. The hospital stores hospital patient medical records in the large "medical records" area that occupies about half of the west side of the Golden L.I.G.H.T. clinic space.

171. According to Administrator A, the respiratory department has an office on the east side of the basement, across the hall from housekeeping. According to Administrator A, documents pertaining to the hospital's respiratory services programs are located in this office.

**B.      The Administrative Annex, 522 North Sawyer Avenue**

172. According to Administrator A, Payawal maintains an office on the southeast end of the third floor of the Annex. According to Administrator A, Payawal uses a computer in his office to access the CPSI data and to create the following financial reports, among others, for the hospital and the Golden L.I.G.H.T. clinics: monthly financial statements; weekly and monthly admissions reports, which track patient admissions by referral source and insurance provider; and daily cash balance reports. Payawal distributes these reports to Novak and Administrator A, among

others, in hard copy and by e-mail. According to Administrator B, Payawal creates accounting reports for the Golden L.I.G.H.T. clinics and emails them to Administrator B.

173. According to Administrator A, the accounts payable office is located in the northeast corner of the third floor of the Annex. Documents pertaining to all hospital payments are housed in this office, including payments to physicians and marketers in exchange for their referrals of patients to the hospital. Such documents include: contracts; invoices; time sheets; purchase orders; check requests; expense reports; checks; and remittances. According to Administrator A, Employee F works in the accounts payable office and uses an assigned computer to generate the documentation necessary for the hospital's payments.

174. According to Administrator A, Employee D maintains an office west of the accounts payable office on the third floor of the Annex. According to Administrator A, Employee D uses a computer in his office to perform accounting functions for Novak-owned business other than Sacred Heart, to include Superior Home Health, Garfield Kidney Center, Chen Medical Center, Chicago R.E.A.C.H., Westside Management, Bentley Management, and Bentley Insurance Group. According to Administrator A, Employee D creates financial analysis and reports for these entities that Novak and Payawal review. According to Administrator A, Employee D emails monthly financial statements for Superior Home Health to Novak and Administrator A.

175. According to Administrator A, personnel who complete the hospital's bills to insurance, including Medicare and Medicaid, maintain three offices on the south

side of the third floor of the Annex, and one office on the north side of the second floor of the Annex.

176.   According to Administrator A, employees of the human resources department, including Employee G, occupy an office on the north side of the hall in the basement of the Annex. All personnel and human resource records for the hospital's employees are maintained in this office.

177.   According to Administrator A and Administrator B, one of the marketers for the Golden L.I.G.H.T. clinics occupies the last office on the north side of the hall in the basement of the Annex. According to Administrator B, this marketer uses a computer in the office to assist Administrator B in compiling the patient referral information for the Golden L.I.G.H.T. clinics into reports that are distributed to Novak, Payawal, and Administrator A.

178.   According to Administrator A, Employee A maintains the first office on the north side of the basement of the Annex.

C.   **The "Red House" Storage, 523 North Spalding Avenue**

179.   According to Administrator A, the hospital stores medical records and x-ray film from 2008 and years prior in the Red House. Patient medical records are kept in boxes stored on rows of shelves in the Red House.

D.   **Reasons for Seizing Hospital Records as Evidence**

180.   Based on my training and experience investigating health care offenses, employees of health care providers, especially large facilities such as hospitals and clinics, often create electronic spreadsheets and ledgers to summarize paper records

81

that document patient referrals, medical services, and other patient- or physician-specific information, such as the spreadsheets described above. These summaries can be used so that executives and management personnel may quickly understand certain data and trends contained in the underlying documentation. These summaries can be distributed to conspirators so that they can simultaneously remain informed of facility census data and the related productivity and costs of patient recruiting sources. In addition, employees often create electronic versions (or scans) of the underlying documentation so that large volumes of paper records may be conveniently stored and accessed, and searched much more accurately and quickly through the use of computerized search functions.

181.    Based on my training and experience, I know that hospitals and health care providers are required to retain patient medical records. In Illinois, hospitals are required to preserve medical records for not less than 10 years under 210 ILCS 85/6.17. CMS strongly encourages hospitals to maintain medical records for up to 10 years because CMS may pursue providers for damages and penalties under the False Claims Act for up to 10 years after a claim is paid. Under 42 CFR 482.24, hospitals are required to retain medical records for at least five years.

182.    Based on my training and experience, I believe that a search of hospital records, including electronic documents and emails, often yields investigative leads relating to:

a.      the identities of individuals and corporate entities conspiring to offer and pay as well as the identities of individuals who solicit and receive

remunerations in return for the referral of patients for the furnishing and arranging of goods and/or services, for which payment may be made in whole or in part by a federal health care benefit program;

b.  the contact information of individuals and/or entities who solicit and receive, as well as the identities of individuals and/or entities who offer and pay, remunerations in return for the referral of patients for the furnishing and arranging of goods and/or services, for which payment may be made in part by a federal health care benefit program;

c.  the timing of communications among co-conspirators involved in the offer and payment, and the solicitation and receipt of prohibited kickbacks;

d.  the methods and techniques used by co-conspirators involved in the offer and payment, and solicitation and receipt, of prohibited kickbacks in return for the referral of patients for the furnishing and arranging of goods and/or services, for which payment may be made in part by a federal health care benefit program;

e.  the terms of unlawful agreements related to unlawful pay-for-patient schemes, including unlawful patient brokering, and sharing and recycling arrangements, as well as the nature of fraudulent billing practices;

f.  the identities of patients requiring goods and/or services for which payment may be made in part by a federal health care benefit program, that are unlawfully referred in return for remunerations;

g.  the locations from which unlawfully referred patients are recruited;

83

    h.      financial reports analyzing costs and revenue from insurance billing associated with sources of patient referrals;

    i.      purported policies and procedures to be followed in the medical treatment of patients;

    j.      medical services performed, or the lack of medical services performed, on particular patients; and

    k.      The dates upon which such medical services were performed and what the provider billed insurance for the services.

183. In order to identify some individual patient medical records relevant to the facts contained in this Affidavit, law enforcement agents analyzed Medicare and Medicaid claims data for multiple health care service providers, including Sacred Heart Hospital and the physicians referenced above, generally for the period January 2009 through February 2013. In some instances, the government commissioned the creation of statistically valid random samples of certain categories of claims sufficient to permit a manageable review of the subset of patient records to support a subsequent loss amount extrapolation for the entire universe of such claims. Through this claims data analysis and sampling, the government has identified approximately 420 patient medical records in the following categories of records that it intends to seize during the search of Sacred Heart:

    a.      A statistical sample of Medicare patients treated in Sacred Heart's ER followed by in-patient hospital services (all doctors);

b.      A statistical sample of Medicaid patients treated in Sacred Heart's ER followed by in-patient hospital services (all doctors);

c.      A statistical sample of Medicare patients treated in Sacred Heart's ER followed by in-patient hospital services (Kuchipudi as attending physician);

d.      All Medicare patients with Kuchipudi as attending physician who received services at Sacred Heart on Saturday or Sunday;

e.      All Medicaid patients with Kuchipudi as attending physician who received services at Sacred Heart on Saturday or Sunday; and

f.      All patients who received a tracheotomy procedure at Sacred Heart.

These patient medical records are identified by patient name and unique Medicare/Medicaid patient number in the government's Under Seal Attachment filed concurrently with this search warrant application and affidavit.

### E.     The Search of Computer Systems

184.    Based upon my training and experience, and the training and experience of specially trained computer personnel whom I have consulted, searches of evidence from computers commonly require agents to download or copy information from the computers and their components, or remove most or all computer items (computer hardware, computer software, and computer-related documentation) to be processed later by a qualified computer expert in a laboratory or other controlled environment. This is almost always true because of the following:

a.      Computer storage devices can store the equivalent of thousands of pages of information.  Especially when the user wants to conceal criminal evidence, he or she often stores it with deceptive file names.  This requires searching authorities to examine all the stored data to determine whether it is included in the warrant.  This sorting process can take days or weeks, depending on the volume of data stored, and it would be generally impossible to accomplish this kind of data search on site.

b.      Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment.  The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert should analyze the system and its data.  The search of a computer system is an exacting scientific procedure which is designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password-protected, or encrypted files.  Since computer evidence is extremely vulnerable to tampering or destruction (which may be caused by malicious code or normal activities of an operating system), the controlled environment of a laboratory is essential to its complete and accurate analysis.

185.   In order to fully retrieve data from a computer system, the analyst needs all storage media as well as the computer.  The analyst needs all the system software (operating systems or interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on hard disk drives or on external media).

86

186.   In addition, a computer, its storage devices, peripherals, and Internet connection interface may be instrumentalities of the crimes and are subject to seizure as such if they contain contraband or were used to carry out criminal activity.

F.     **Procedures to Be Followed in Searching Computers**

187.   The warrant sought by this Application does not authorize the "seizure" of computers and related media within the meaning of Rule 41(c) of the Federal Rules of Criminal Procedure. Rather the warrant sought by this Application authorizes the removal of computers and related media so that they may be searched in a secure environment.

188.   With respect to the search of any computers or electronic storage devices seized from the locations identified in Attachments A, B, and C hereto, the search procedure of electronic data contained in any such computer may include the following techniques (the following is a non-exclusive list, and the government may use other procedures that, like those listed below, minimize the review of information not within the list of items to be seized as set forth herein):

a.     examination of all of the data contained in such computer hardware, computer software, and/or memory storage devices to determine whether that data falls within the items to be seized as set forth herein;

b.     searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth herein (any data that is encrypted and unreadable will not be returned unless law enforcement personnel have determined that the data is not (1) an

87

instrumentality of the offenses, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of the offenses specified above);

      c.      surveying various file directories and the individual files they contain to determine whether they include data falling within the list of items to be seized as set forth herein;

      d.      opening or reading portions of files in order to determine whether their contents fall within the items to be seized as set forth herein;

      e.      scanning storage areas to discover data falling within the list of items to be seized as set forth herein, to possibly recover any such recently deleted data, and to search for and recover deliberately hidden files falling within the list of items to be seized; and/or

      f.      performing key word searches through all storage media to determine whether occurrences of language contained in such storage areas exist that are likely to appear in the evidence described in Attachment D.

189.    Any computer systems and electronic storage devices removed from the premises during the search will be returned to the premises within a reasonable period of time not to exceed 30 days, or unless otherwise ordered by the Court.

## XI.   CONCLUSION

190.    Based upon the information set forth above, there is probable cause to support a criminal complaint charging that from no later than March 2012 through in or around March 2013, Edward Novak, Roy Payawal, Dr. Venkateswara R. Kuchipudi, also known as "V.R. Kuchipudi," Dr. Percy Conrad May, Jr., Dr. Subir Maitra, and Dr.

Shanin Moshiri, also known as "Shawni Moshiri," and others known and as yet unknown, have conspired to knowingly and willfully offer and pay, and solicit and receive, remunerations directly and indirectly, overtly and covertly, in return for the referral of patients for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a federal health care program, in violation of Title 42, United States Code, Section 1320a-7b(b), all in violation of Title 18, United States Code, Section 371.

191.    Based upon the information set forth above, there is also probable cause to support applications for warrants to seize $1,229,740.85 maintained in First Merit Bank account number XXXXXX1762, held in the name of Sacred Heart Hospital, and $101,123.95 maintained in JP Morgan Chase account number XXXXXX0917, held in the name of V.R. Kuchipudi M.D. S.C, doing business as Brookpark Medical Center, which funds constitute or are derived from proceeds traceable to the receipt of kickbacks in violation of Title 42, United States Code, Section 1320a-7b(b) and are subject to forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(C).

192.    Finally, based upon the information set forth above, there is probable cause to support applications for the issuance of warrants to search Sacred Heart Hospital and its administrative and record storage facilities, which are described in greater detail in Attachments A through C, for evidence and instrumentalities relating to violations of: (A) the federal anti-kickback statute (Title 42, United States Code, Section 1320a-7b(b)); and (B) the federal health care fraud statute (Title 18, United States Code, Section 1347) in connection with schemes involving Sacred Heart

executives, administrators, physicians, employees, and associated individuals to defraud federal health care benefit programs by billing for services for which payment is not authorized, because (1) the services rendered to the patient were not medically necessary, and/or (2) the patients to whom the services were provided were referred to the treating provider in return for the payment of an unlawful kickback.

FURTHER AFFIANT SAYETH NOT

CATHY A. BARBOUR
SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION

Subscribed and sworn
before me this 15th day of April, 2013

HONORABLE DANIEL G. MARTIN
UNITED STATES MAGISTRATE JUDGE

90

## ATTACHMENT A

### Description of Premises to Be Searched – Sacred Heart Hospital

The following areas of Sacred Heart Hospital, a four-story yellow brick building located at 3240 West Franklin Boulevard, Chicago, Illinois:

- Offices of Novak, his administrative assistant, and Employee E in the executive suite located in the southeast corner of the first floor of the hospital.

- Reception area across the lobby to the west of the executive suite on the south side of the first floor of the hospital.

- Information technology office located to the west of the reception area on the south side of the first floor of the hospital.

- Administrator A's office located on the southeast corner of the third floor of the hospital.

- Administrator B's office located to the south of the waiting area located in the middle of the Golden L.I.G.H.T. clinic space in the northwest quadrant of the first floor of the hospital.

- Workstations and computers located in the area outside Administrator B's office, south of the waiting area located in the middle of the Golden L.I.G.H.T. clinic space in the northwest quadrant of the first floor of the hospital.

- File room located to the west behind the waiting area located in the middle of the Golden L.I.G.H.T. clinic space in the northwest quadrant of the first floor of the hospital.

- "Central supply" area occupying most of the east side of the Golden L.I.G.H.T. clinic space in the northwest quadrant of the first floor of the hospital.

- Respiratory department office on the east side of the basement, across the hall from housekeeping.



## ATTACHMENT B

### Description of Premises to Be Searched – The Annex

The following areas of the three-story red and brown brick building located at 522 North Sawyer Avenue, Chicago, Illinois, commonly referred to as "The Annex" of Sacred Heart Hospital, located to the north and on the east side of Sacred Heart Hospital:

- Payawal's office on the southeast end of the third floor of the Annex.

- Accounts payable office in the northeast corner of the third floor of the Annex.

- Employee D's office west of the accounts payable office on the third floor of the Annex.

- Three billing offices on the south side of the third floor of the Annex.

- One billing office on the north side of the second floor of the Annex.

- Human resources department office of Employee G in the basement of the Annex.

- Marketer office in the basement of the Annex.

- Employee A's office in the basement of the Annex.



## ATTACHMENT C

### Description of Premises to Be Searched – The Red House

The two-story red brick house located at 523 North Spaulding Avenue, Chicago, Illinois, commonly referred to as "The Red House," located to the north and on the west side of Sacred Heart Hospital.



## ATTACHMENT D

## LIST OF ITEMS TO BE SEIZED

Evidence and instrumentalities concerning violations of Title 42, United States Code, Section 1320a-7b, and Title 18, United States Code, Sections 371 and 1347, in any form or container, including electronic or digital files residing on computers and other data storage devices, for the period 2008 to the present, as follows:

1.      Items relating to any contractual, agency, or business relationship between (a) Sacred Heart Hospital and (b) any physician or physician services company, including correspondence, notes, contracts, employment agreements, rental agreements, directorships, educational programs, insurance policies, and drafts of same.

2.      Items relating to any contractual, agency, or business relationship between (a) Sacred Heart and (b) any person or entity engaged in recruiting or referring patients to Sacred Heart, including employees, independent contractors, marketers, marketing agencies, consultants, consulting firms, hospitals, medical clinics, and nursing homes, including correspondence, notes, contracts, employment agreements, service agreements, marketing agreements, marketing materials, financial records, and drafts of same.

3.      Items relating to any payment, compensation, or remuneration, in any form, paid by Sacred Heart directly or indirectly to any person or entity referenced in paragraphs 1(b) and 2(b) above.

4.     Items relating to duties performed by physicians, Employee A, Employee B, and Employee C at Sacred Heart, including time sheets, sign-in sheets, notes, reports, work product, minutes, calendars, appointment books, and logs.

5.     Analyses of patient admissions and tracking of patient referrals to Sacred Heart by source of referral, including Sacred Heart employees, physicians, independent contractors, marketers, marketing agencies, consultants, consulting firms, hospitals, medical clinics, and nursing homes, including admissions logs, patient referral/admission face sheets, summaries, spreadsheets, ledgers, accounting books and records, and any related notes and correspondence.

6.     Items pertaining to the scheduling of physicians at Sacred Heart, including schedules for the emergency room, operating rooms, on-call availability, weekday, and weekend shifts.

7.     Items relating to any teaching and education of medical students including Sacred Heart's medical student program, including lists of medical student participants and physician instructor/supervisors, schedules, time sheets, course and student evaluations, notes and correspondence, written reports, guidelines, training and educational materials.

8.     Items relating to the transportation and movement of patients to and from Sacred Heart, including patient transfer orders and any records of a contractual, employment, agency, or business relationship between (i) Sacred Heart and (ii) any person or entity engaged in the transportation of patients to and from Sacred Heart, including correspondence, notes, patient transfer orders and instructions, contracts, invoices and records of payment.

9.      Meeting minutes and any notes, agendas, outlines, powerpoint presentations, or other documents reflecting the substance of meetings of the medical executive committee, the critical care committee, and the performance improvement and utilization review committee.

10.     Audio and video recordings of any meetings referenced in Paragraph 8 above.

11.     Personnel files for all executives, administrators, accounting, marketing, and health care employees of Sacred Heart, including contracts between employees and Sacred Heart, and terms of compensation, and disciplinary records.

12.     Patient medical records, including those related to intake, admitting physician, treating physician, emergency and observation services, in-patient admission, progress notes, physician orders, consults, laboratory and diagnostic test results, surgical notes, prescription and administration of medication, discharge planning, referral and transfer to another health care service provider, including long-term acute care facility, skilled nursing facility, and home health agency.[1]

13.     Policies, procedures and protocols pertaining to respiratory therapy, intubations, tracheotomies, emergency room services, observation services, surgical consultations, in-patient admissions, patient care, and treatment.

14.     Financial records relating to Sacred Heart and any business affiliated with Sacred Heart Hospital, including the Golden L.I.G.H.T. clinics, Chen Medical Center, Garfield Kidney Center, Superior Home Health LLC, Chicago R.E.A.C.H.

---

[1] By separate motion filed under seal, the government will submit a list of the patient medical records that it intends to seize from the relevant subject premises.

Foundation, Westside Management Corp., Bentley Management LLC, Bentley Insurance Group, BMG Management LLC, and Park Place LLC. The financial records shall include general ledgers, accounting books and records, balance sheets, financial statements, bank statements, bank books, checkbooks, checks, check requests, expense reports, certificates of deposit, brokerage and investment account records, stock certificates, credit cards and credit card statements, tax returns, tax return information, property appraisal, mortgage and title documents, as well as any safe deposit box keys and storage facility keys.

15.    Documents related to record retention policies for patient medical records and other records of Sacred Heart, including the locations for on-site and off-site storage of documents.

16.    Records of insurance billings for services provided or services claimed to be provided to patients of Sacred Heart, including insurance claim forms, billing statements, invoices, requests for payment, receipts, checks, accounting books and records, spreadsheets, ledgers, and any related notes and correspondence.

17.    Bulletins, manuals, guidance, publications from, and any correspondence with Illinois Public Aid (Medicaid), Medicare or any of its contractors, including CMS, NGS and WPS.

18.    Documents related to any inspection, investigation, or survey by CMS, or any federal or state agency related to health care services provided at Sacred Heart.

19.    Training materials, literature, articles, guidance, or communications regarding federal anti-kickback and health care fraud laws.

## ADDENDUM TO ATTACHMENT D

This warrant does not authorize the "seizure" of computers and related media within the meaning of Rule 41(c) of the Federal Rules of Criminal Procedure. Rather this warrant authorizes the removal of computers and related media so that they may be searched in a secure environment. The search shall be conducted pursuant to the following protocol:

With respect to the search of any computers or electronic storage devices removed from the premises described in Attachments A, B, and C hereto, the search procedure of electronic data contained in any such computer may include the following techniques (the following is a non-exclusive list, and the government may use other procedures that, like those listed below, minimize the review of information not within the list of items to be seized as set forth herein):

a.      examination of all the data contained in such computer hardware, computer software, and/or memory storage devices to determine whether that data falls within the items to be seized as set forth herein;

b.      searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth herein (any data that is encrypted and unreadable will not be returned unless law enforcement personnel have determined that the data is not (1) an instrumentality of the offenses, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of the offenses specified above);

c.      surveying various file directories and the individual files they contain to

determine whether they include data falling within the list of items to be seized as set

forth herein;

d.      opening or reading portions of files in order to determine whether their

contents fall within the items to be seized as set forth herein;

e.      scanning storage areas to discover data falling within the list of ems to

be seized as set forth herein, to possibly recover any such recently deleted data, and to

search for and recover deliberately hidden files falling within the list of items to be

seized; and/or

f.      performing key word searches through all electronic storage media

to determine whether occurrences of language contained in such storage media exist

that are likely to appear in the evidence described in Attachment D.

The government will return any computers or electronic storage devices removed

from the premises described in Attachments A, B, and C hereto within 30 days of the

removal thereof, unless contraband is found on the removed computer and/or electronic

storage device, or unless otherwise ordered by the Court.

## ATTACHMENT E

**Funds to be Seized from Sacred Heart Hospital**

$1,229,740.85 maintained in First Merit Bank, account number XXXXXX1762, held in the name of West Side Community Hospital, Inc., also known as Sacred Heart Hospital, Operating Account.

**Funds to be Seized from Venkateswara R. Kuchipudi**

$101,123.95 maintained in JP Morgan Chase account number XXXXXX0917, held in the name of V.R. Kuchipudi M.D. S.C, doing business as Brookpark Medical Center.